STATE v. WALLACE RAY.

(Filed 30 May, 1914.)

1. Trials — Improper Arguments—Courts—Correction—Appeal and Error—Presumptions.

Remarks made by a solicitor in the prosecution of a case relating to extraneous matters, calculated to unduly prejudice the defense, should, in proper cases, be promptly rebuked from the bench, with such instruction as will remove from the minds of

STATE *v.* RAY.

the jury the prejudice that may have been caused thereby; and when a motion for relief has been made in the trial court based upon matters of this character, set out in an affidavit, upon which the court has not stated the facts, or there are no such findings appearing in the record on appeal, and it does not appear that he was requested to state them, it will be presumed that the facts were found adversely to the appellant, or that the prejudice had been properly removed in some way by the trial judge. This Court cannot consider the affidavit as findings of fact.

2. Homicide—Trials—Defendant's Fault—Evidence.

Upon this trial for homicide it is held that defendant's prayer for special instruction was properly refused, that "there was no evidence that he (the prisoner) did or said anything to bring on the difficulty with the deceased," there being evidence that he was the aggressor and entered into the fight willingly, and that the deceased, after making the assault, had retreated from five to seven steps, and the prisoner followed him and inflicted the mortal wound with a pistol shot.

3. Same—Instructions.

When one, without fault, has been murderously assailed, he may stand his ground and defend himself even to the extent of taking the life of the assailant, when such is necessary, or it reasonably appears to him to be so, it being for the jury to determine the reasonableness of this necessity from the surrounding circumstances, as they appeared to the prisoner at the time; and where there is evidence tending to show that the prisoner, having been assaulted by the deceased, following him some six or seven steps, while the latter was retreating, and inflicted the deadly wound with a pistol shot, an instruction requested by the defendant upon the law of self-defense which omits the view that the defendant must be without fault in bringing on the difficulty, was properly refused.

4. Trials—Instructions—Self-defense—Necessity to Kill—Questions for Jury.

The charge of the court to the jury should be construed as a whole, and upon a trial for homicide, wherein the plea of self-defense was relied on, it is not reversible error for the court to instruct the jury that the prisoner must have killed the deceased to save himself from death or great bodily harm, it appearing from the other parts of the charge that the jury were instructed to pass upon the matter in the view of the reasonableness of the necessity as it appeared to the prisoner at the time and under the circumstances, which instruction they could not have misunderstood.

APPEAL by defendant from *Carter, J.,* at September Term,. 1913, of MADISON.

We will state the substance of so much of the testimony as bears upon the exceptions of the prisoner, Wallace Ray.

The defendant and one Logan Franklin were indicted for the murder of Greeley Hensley in December, 1912. During the trial a verdict of not guilty was entered as to Logan Franklin.

Gaither Shelton, a witness for the State, testified that the killing occurred near his store on Shelton Laurel. It was on Sunday, and the deceased went to his store with one Bessie Kirk in the evening. They left, and not long after the witness and others in the store heard a pistol or gun shot, and very soon Logan Franklin appeared at the door of the store and said, "Boys, there is a dead man out here. Greeley Hensley is killed." They went out and saw deceased lying on his back, and the defendant was on his mule about eight or ten steps from him. No one was there but the defendant. Bessie Kirk came shortly after the witness got there. They did not see any weapon in the hands of the deceased or on or about him as he was lying, but one of the men pulled his coat back and found a pistol at his side in the holster, and took it out. The defendant stated to witness that he had to do it in self-defense. He was very much intoxicated.

Bessie Kirk testified that she was with the deceased on the day of the homicide. She met him on that morning at Chapel Hill, about 7 miles from Shelton Laurel, where the homicide occurred. After visiting several places and buying about one-half gallon of whiskey, one John Shelton, who was with them, went in one direction and witness and deceased went in another towards Gaither Shelton's store. Deceased had a pistol, but it had three empty shells in it, and he did not have any other cartridges. When they started, he had one loaded shell, but he shot that one in the field to attract Shelton and let him know where they were, as he had promised to meet them at a certain place; they were walking through the field and he riding around.

This witness did not see the shooting, but testified as to what occurred just before and immediately after the shooting, as follows: "I saw Jim first at the store. He came into the store, and

STATE *v.* RAY.

Wallace and Logan stopped in the yard, at the head of the porch, on their mules. Wallace said, 'Hello, there!' to Greeley, and he looked around and said, 'Hello.' Wallace told him to come out there, that he wanted to speak to him. Greeley went out and got up on Wallace's mule, facing Wallace; he was on the mule's neck, and Wallace shook hands with him. They shook hands, and then Wallace put his arm around Greeley and pulled him down and kissed him, and then Greeley gave him a bottle of whiskey; they then went down the road below the storehouse a piece; Logan Franklin went with them. Jim Shelton was in the store with Gaither Shelton. They only went down the road a little piece; they did not go out of sight. I told Greeley to come on and let's go. He was still on the mule, and I told him to come on and let's go, and he got off the mule from behind Wallace, and then he tried to get up behind Wallace again, and he could not do it, and Logan Franklin got down off his mule and helped Greeley up in his saddle. They then went up the road a little piece, and then Greeley got off Logan's mule and Logan got up in the saddle and Greeley was walking between Logan and Wallace, and Greeley had one hand on Logan's knee and the other on Wallace's mule, I think. I said to Greeley, 'Come on, let's go,' and he said, 'All right, in a minute.' They were all laughing. I then went up to Lovada Cutshall's, about twenty steps from the store. The house is in the store yard. I did not see anything more. I heard the gun fire. It seemed like about four shots. I do not know exactly how many. Two shots and then, in about a thought, two more. They all sounded about the same. I then ran back there to him. Jim and Gaither and I got there about the same time. When I got there he was lying on his back in the road with both hands spread out. I did not see any pistol in his hands or on the ground. Wallace was on his mule down below Greeley."

She further testified: "Gaither asked Wallace what made him kill him, and Wallace said he had to do it; and Gaither said, 'If you had to do it, where is his knife or where is his gun, or any of his weapons?' and he said twice that he had to do it. It was Logan or Jim, one—Logan, I think—took the gun up after they turned him over. They took hold of his left arm and

dragged him over to his left side. His head was in my lap. They pulled his coat back and got his gun out of his holster. I saw them take the pistol out of the holster. The holster was under his back before they turned him over. They pulled the pistol out and Gaither told them to put it back. I saw Wallace Ray take his gun out and reload it."

Charlie Hensley testified to examining the body of the deceased on the day after he was killed, and said: "He had a sweater on that pulled down over his hips, and it was rolled up in front; we had to cut it off to get at the place he was shot. We found one hole, as near as I can guess, something like 1¼ inches above his left nipple; the other was something like from 4 to 6 inches above; then in the back of the head there was a place about 1½ inches long. It appeared to be a bruise part of the way. It was black all along in the palm of his hand and on his forefinger and thumb. I took it to be a powder burn. I saw his pistol. Briggs took it out and opened it, and it had three empty cartridge hulls in it. It was a large pistol. I think it was a .38. We examined his pockets and did not find any cartridges in them."

The defendant testified: "When we got above the store two or three steps, Greeley Hensley said, 'I want a drink of whiskey,' and I said I had no whiskey, and he said I was a liar, and then we climbed down off our mules. I was some 8 or 10 feet from him when the difficulty started. I do not know which one got on the ground first. I got on the ground because I thought he was going to shoot. Then Greeley Hensley went behind Jim Shelton's mule. He was down the road and some five or six steps from me. At that time I would think he was something near in front of the store door. I walked down towards him. I do not know where Logan Franklin was at that time. When I got down next to Greeley, he turned and walked backwards down the road. I guess he stepped from five to seven steps."

"Q. And then you advanced on him—following him up? A. Yes, sir.

"Q. And you were telling him all the time, what? A. Told him if he treated me halfway right I would be as good a friend as he had.

"Q. You said that in a way to let him know that he had to treat you right, didn't you? A. No, sir."

"He did not back any further. When I killed him I was about three steps from him. I don't know whether I shot him in the left hand or not. I do not deny that his left hand was powder burnt. He fell backwards when I shot. I shot three times. Greeley Hensley shot one shot just before my pistol fired."

That the defendant entered into the fight willingly also appears from the testimony of Logan Franklin, who testified as a witness for the defendant. Referring to both the deceased and the defendant, this witness said: "The way the boys were talking, I saw they wanted trouble."

The court charged the jury, in part, as follows: "When, as in this case, the plea is self-defense, and the killing with a deadly weapon is established or admitted, two presumptions arise: first, that the killing was unlawful; second, that it was done with malice. An unlawful killing is manslaughter, and when there is established an element of malice, it is murder in the second degree. When the defendant sets up the plea of self-defense he must rebut both presumptions: the presumption that the killing was unlawful and the presumption that it was done with malice. If he stops when he has rebutted the presumption of malice, the presumption that the killing was unlawful still stands, and, unless rebutted, the defendant is guilty of manslaughter. This extract is read to you from a recent decision of our Supreme Court, and I should have prefaced it by stating to you that the evidence in this case is that the killing with a deadly weapon is admitted, and the law imposes upon the defendant the burden of proving such mitigating circumstances as would reduce the grade of the offense from murder in the second degree to manslaughter, and if he would entitle himself to an acquittal, the further burden is upon him of proving that the killing was justifiable or excusable. The burden is upon him to prove such mitigation or excuse to the satisfaction of the jury. He is not required to prove it beyond a reasonable doubt, but he must satisfy the jury of it; and when the killing with a deadly weapon is admitted, as in this case, unless the defendant has satisfied the jury of circumstances of mitigation, it is the

duty of the jury to convict him of murder in the second degree. And although he may have satisfied the jury that there were mitigating circumstances, that is to say, the killing was without malice, it is the duty of the jury to convict him of manslaughter, unless he shall have further satisfied the jury that the killing was excusable upon the principle of self-defense. Now, understand, gentlemen, the killing with a deadly weapon being proven beyond a reasonable doubt, or admitted by the defendant, if nothing else appeared in the case, it would be your duty to convict him of murder in the second degree. If he would reduce the grade of the killing from murder in the second degree to manslaughter, he must satisfy the jury that the killing was without malice; and if he would further excuse the killing upon the principle of self-defense, he must satisfy the jury that the killing was from necessity upon the principle of self-defense. The defendant has asked me to give you certain special instructions, which I do, and which you will take and deem the law in the case in all respects as if they were embraced in my general charge:

"1. The court charges you that the defendant, at the time of the homicide, was where he had a right to be, and it is contended by him that there is no evidence that he did or said anything to provoke or bring on the difficulty with the deceased.

"2. If the jury shall find from the evidence that the deceased, Greeley Hensley, said to the defendant, 'Back off there, you son of a bitch; I have had it in for you a long time,' at the same time drawing his pistol, and the defendant being without fault, and under the reasonable apprehension that he was about to suffer death or great and enormous bodily harm, fired and killed the deceased, then the court charges you that such killing would be excusable on the ground of self-defense, and it would be your duty to return a verdict of not guilty.

"3. If the jury shall find from the evidence that the defendant was without fault, and the deceased made an assault upon him with a pistol with intent to kill him, then the court charges you that the defendant was not required to retreat, but had the right to stand his ground and kill his adversary if necessary to save his own life or to protect his person from great bodily harm.

STATE *v.* RAY.

"4. The necessity, real or apparent, of taking the life of the deceased is a question to be determined by you upon the facts as they reasonably appeared to the defendant at the time of the homicide, and though you may find from the evidence that the pistol of the deceased was not loaded, yet if you shall further find from the evidence that the deceased drew his pistol on the defendant, and the defendant being himself without fault in bringing on the difficulty and acting under a reasonable apprehension that he was about to suffer death or great bodily harm at the hands of the deceased, fired and killed him, then the court charges you that the defendant would not be guilty, and you would so find.

"5. If the jury shall find from the evidence that the pistol of the deceased was not loaded, then the court charges you that there is no evidence that the defendant had any knowledge of that fact, and unless he had such knowledge, he had the right to presume that the pistol was loaded, and act upon that presumption in his own proper self-defense.

"6. If you shall find from the evidence that the deceased assaulted the defendant with a pistol in such manner as would lead the defendant to believe that he was about to suffer death or great bodily harm at the hands of the deceased, and that the defendant himself was without fault in bringing on the difficulty, then the court charges you that the defendant had the right to use his own pistol in his own defense, and to continue to use it until the deceased was disarmed, or until the danger, real or apparent, no longer existed.

"7. The court charges the jury that the previous troubles and difficulties of the defendant should not be considered by you as substantive evidence in passing upon the question of the guilt or innocence of the prisoner. You are not trying the prisoner for any previous crime he may or may not have committed, but any evidence in regard to previous crimes or troubles can only be considered by you in so far as the same may tend to impeach the credibility of the defendant.

"8. The court charges the jury that any admission of the defendant as to any previous troubles with other parties would not be any direct evidence bearing on the question of his guilt in this case.

"The defendant admits the killing with a deadly weapon, and nevertheless asks you to acquit him upon the ground, as contended by him, that in slaying the deceased he was acting from necessity in his own proper self-defense. Where a man is violently assailed and is put in reasonable fear that he is about to suffer death or great bodily harm, he not being at fault in bringing on the difficulty either by having spoken words calculated and intended to provoke it, or without having entered the fight willingly, he has a right in his own proper self-defense to employ such force as under all the surrounding circumstances appeared to him reasonable to secure his own safety. The law, however, exacts of a defendant under circumstances of this sort entire good faith. The law excuses the killing in self-defense upon the principle of necessity—a real necessity or an apparent necessity. Where such real or apparent necessity exists, the defendant being himself without fault, as explained to you, in bringing on the difficulty, he has a right to slay in his own defense where he acts honestly for that purpose."

The prisoner, Wallace Ray, was convicted of manslaughter, and appealed from the judgment.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*Gudger & McElroy and Martin, Rollins & Wright for defendant.*

WALKER, J., after stating the case: The prisoner complains that his case was not fairly tried in the court below, but was unduly prejudiced by certain remarks made by the solicitor in his address to the jury. This matter was brought to the attention of the judge by an affidavit of the prisoner, submitted on his motion for a new trial. The remarks of the solicitor, as set forth in the affidavit, were highly improper, and should have been met with a prompt and stern rebuke from the bench, if they were made; but there is no finding of fact by the judge based upon the affidavit, and we are not at liberty to find them ourselves. We cannot consider affidavits upon such a motion, but the party complaining must request the judge to find the facts or there must be an admission of the truth of the statements

contained in the affidavit. We must, therefore, assume that the remarks were not made as set forth, or, if they were, that the judge administered the proper correction and removed any prejudice arising therefrom. Parties complaining of improper remarks made by counsel must object thereto in apt time and proper form. We said in *S. v. Tyson,* 133 N. C., at p. 698, citing many cases: "The conduct of a trial in the court below, including the argument of counsel, must be left largely to the control and direction of the presiding judge, who, to be sure, should be careful to see that nothing is said or done which would be calculated unduly to prejudice any party in the prosecution or defense of his case, and when counsel grossly abuse their privilege at any time in the course of the trial, the presiding judge should interfere at once, when objection is made at the time, and correct the abuse. If no objection is made, while it is still proper for the judge to interfere in order to preserve the due and orderly administration of justice and to prevent prejudice and to secure a fair and impartial trial of the facts, it is not his duty to do so, in the sense that his failure to act at the time or to caution the jury in his charge will entitle the party who alleges that he has been injured to a new trial. Before that result can follow the judge's inaction, objection must be entered at least before verdict." If we accept the affidavit as properly reciting the facts, it appears therefrom that the judge did act promptly, and told the jury that the remarks were improper, and we must take it that everything was done to safeguard the prisoner's rights. Exceptions 1 and 2, therefore, are overruled.

The prisoner next excepted to the refusal of the court to give his special prayer for instruction to the jury, viz.: "There is no evidence that he did or said anything to provoke or bring on the difficulty with the deceased." This prayer was properly refused, as there was evidence in the case not only that the prisoner was the aggressor, but that he shot the deceased when he was retreating and under circumstances which would have warranted a verdict for murder in the first degree. His own testimony was sufficient for this purpose: "When I got down next to Greeley Hensley, he turned and walked backwards down the road. I guess he stepped from five to seven steps, and I then advanced

on him—following him up." There was other evidence that justified the refusal of this instruction. This covers exceptions 3 and 4.

The 5th and 6th exceptions were taken to the court's modification of the prisoner's fourth and sixth requests for special instructions, by which the court inserted in each of the prayers the words, "and the defendant being himself without fault in bringing on the difficulty." We do not know certainly whether the contention of the prisoner is that the instruction should not, in law, have been restricted or qualified by the use of those words, or whether the point is that there was no evidence that the prisoner was in fault, and for that reason this should not have been made by the court. We have already disposed of the latter ground for the exception. As to the former, it may be remarked that the prisoner himself inserted similar language in his second and third prayers concerning his plea of self-defense. But the amendment of the instruction was right in itself. We may take it now as the settled law of this State that, "where a man provokes a fight by unlawfully assaulting another, and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his life. This is ordinarily true where a man unlawfully and willingly enters into a mutual combat with another and kills his adversary. In either case, in order to excuse the killing on the plea of self-defense, it is necessary for the accused to show that he 'quitted the combat before the mortal wound was given, and retreated or fled as far as he could with safety, and then, urged by mere necessity, killed his adversary for the preservation of his own life.' Foster's Crown Law, p. 276." The same doctrine was more fully stated in *S. v. Blevins,* 138 N. C., 668: "It has been established in this State by several well considered decisions that where a man is without fault, and a murderous assault is made upon him—an assault with intent to kill—he is not required to retreat, but may stand his ground, and if he kills his assailant, and it is necessary to do so in order to save his own life or to protect his person from great bodily harm, it is excusable homicide, and will be so held (*S. v. Harris,* 46 N. C.,

190; *S. v. Dixon,* 75 N. C., 275; *S. v. Hough, ante,* 663); this necessity, real or apparent, to be determined by the jury on the facts as they reasonably appeared to him. True, as said in one or two of the decisions, this is a doctrine of rare and dangerous application. To have the benefit of it, the assaulted party must show that he is free from blame in the matter; that the assault upon him was with felonious purpose, and that he took life only when it was necessary to protect himself. It is otherwise in ordinary assaults, even with a deadly weapon. In such case a man is required to withdraw if he can do so, and to retreat as far as consistent with his own safety. *S. v. Kennedy,* 91 N. C., 572. In either case he can only kill from necessity. But, in the one, he can have that necessity determined in view of the fact that he has a right to stand his ground; in the other he must show as one feature of the necessity that he has retreated to the wall." And in *S. v. Hough,* 138 N. C., 663, we said: "If the assault was committed under such circumstances as would naturally induce the defendant to believe that the deceased was capable of doing him great bodily harm and intended to do it, then the law would excuse the killing, because any man who is not himself legally in fault has the right to save his own life or to prevent enormous bodily harm to himself." These cases were reviewed and approved in *S. v. Lucas,* 164 N. C., 471, and more recently in *S. v. Robertson, ante,* 356, and to them, as precedents, may be added *S. v. Dixon,* 75 N. C., 275; *S. v. Brittain,* 89 N. C., 481, and *S. v. Clark,* 134 N. C., 698.

The writer of this opinion was somewhat doubtful, when the *Blevins* and *Garland cases* were decided, whether the doctrine should be carried to such an extreme length, believing that, in many cases, it might be very harsh and unjust in its application, and knowing that it was derived from an author who wrote at a time when the law was not as tender in its regard for human life as it has been in later days; but it is the established law and has strong authority, in addition to our own cases, to support it. It is essential, perhaps, to the due administration of justice and the peace of society, and may be the cause of preventing frequent brawls and breaches of the law, and in its general operation contribute to the safety and preservation of human life. If, there-

fore, a murderous assault is made upon a man, and his life or limb is put in jeopardy, he may stand his ground and defend himself, even to the taking of human life, but with this qualification, that he must not, by his own fault, have brought the necessity of so doing upon himself, in which case, if he kills, it is murder or manslaughter, according to the circumstances. If the law were otherwise, he who is guilty of the first offense might have committed it for the very purpose of seeking, under its cover and protection, an opportunity of slaying his enemy, or his adversary, for some real or imagined grievance. For this reason we have adopted the principle in the law of homicide already stated, and as given by Foster in his Crown Law, p. 276, and to which, as will appear in *Garland's case,* we have added this other statement by him, at p. 277: "He, therefore, who in case of a mutual conflict would excuse himself on the plea of self-defense must show that before the mortal stroke was given he had declined any further combat and retreated as far as he could with safety, and also that he killed his adversary through mere necessity and to avoid immediate death. If he faileth in either of these circumstances he will incur the penalty of manslaughter." To the same effect is Lord Hale, who lays it down, "That if A. assaults B. first, and upon that assault B. reassaults A., and that so fiercely that A. cannot retreat to the wall or other *non ultra* without danger of his life, and then kills B., this shall not be interpreted to be *se defendendo,* but to be murder or simple homicide (manslaughter), according to the circumstances of the case; for, otherwise, we should have all the cases of murder or manslaughter, by way of interpretation, turned into *se defendendo.*"

The same principle was stated by *Justice Hoke* in *Garland's case,* as having been applied in *S. v. Brittain,* 89 N. C., 481, and may be thus formulated:

When it appears that the prisoner had made an assault upon A. and was reassaulted so fiercely that he could not retreat without danger to his life, and he kills A., the killing cannot be excused upon the ground of self-defense. The first assailant has done the first wrong and, thereby, has brought upon himself the

necessity of slaying his adversary, and is, therefore, not entitled to the favorable consideration of the law.

We think the presiding judge correctly stated this principle to the jury in his charge.

We may repeat here what we substantially said in *S. v. Robertson, supra:* The jury could well have found upon the testimony that the prisoner fought, not only willingly, but aggressively, and that the whole difficulty is traceable to his original misconduct.

The prisoner further excepts because the court instructed the jury once or twice that in order to sustain the plea of self-defense the prisoner must have acted from *necessity,* in other words, that the killing should have been really *necessary* to the protection of his own life or to save him from great bodily harm. But we do not so understand the charge, which must be construed as a whole and not in segments. *S. v. Exum,* 138 N. C., 599; *Kornegay v. R. R.,* 154 N. C., 389; *Bird v. Lumber Co.,* 163 N. C., 162. The court had fully explained to the jury what the term "necessity" meant in the law of homicide—that it was either *real* or *apparent* necessity—and he impressed clearly upon the jury the view that if the prisoner slew the deceased from either real or apparent necessity, he was entitled to an acquittal, and when he used the word "necessity," it was simply for the purpose of distinguishing between the two grades of homicide, murder and manslaughter, by drawing the attention of the jury to the fact that if the prisoner fought and killed under the influence of passion merely, and not from the "necessity" of saving himself from death or bodily harm, it would be manslaughter, and this is what was emphasized in *S. v. Garland, supra.* There can be no mistake as to the correctness of Judge Carter's charge to the jury, for at the very last, and after he had illustrated the difference between murder and manslaughter and used the words considered as objectionable, he told the jury that "the law excuses the killing in self-defense upon the principle of necessity— a real necessity or an apparent necessity." There was no conflict or uncertainty in this charge, but it was clear, comprehensive, and consistent throughout, and intelligible to the most ordinary mind.

166—28

What we said in *S. v. Price,* 158 N. C., 641, is applicable here: "It is true, the court told the jury that the prisoners must have killed in their necessary self-defense, but he explained to the jury what was meant by this expression in other parts of the charge, and substantially instructed the jury, in language that could not well have been misunderstood, that if they had a reasonable apprehension, under the circumstances surrounding them, that they were about to suffer death or serious bodily harm, their act in slaying the deceased was excusable in law, and they should acquit the prisoners. The charge must be read and construed as a whole. *S. v. Exum, supra; Kornegay v. R. R.,* 154 N. C., 389; *S. v. Lewis, ibid.,* 632. When thus considered, it was a full and clear exposition of the law as applicable to the facts. This case bears no resemblance to *S. v. Barrett,* 132 N. C., 1005, and *S. v. Clark,* 134 N. C., 699." The prisoner's counsel relied on *S. v. Barrett, supra; S. v. Clark, supra,* and *S. v. Morgan,* 136 N. C., 628; but they are no more authorities for the contention than they were for a similar one in *S. v. Price, supra.*

The charge, in its entirety, was exceedingly fair and favorable to the prisoner. He has had the benefit of every principle of law to which he was legally entitled, and the evidence was fully explained to the jury in its different bearings, and in every possible phase of it.

A careful review of the record convinces us that no error was committed at the trial.

No error.