STATE v. DAVID KIRKMAN.

(Filed 20 November, 1935.)

**Homicide E a—Evidence in this case held sufficient to raise the question of self-defense for the determination of the jury.**

In this prosecution for homicide, defendant's testimony was to the effect that he had been missing corn from his barn, that on the night in question he was aroused by the barking of his dog, that he dressed and took his shotgun to investigate and in the dark barely discerned a man stand-

ing neared the barn, that defendant holloed and that the intruder commanded him to get back and approached defendant and was apparently fumbling for a weapon, and that defendant then shot, intending to frighten the intruder, but resulting in his death. *Held:* Defendant was entitled to have the question of self-defense submitted to the jury, and an instruction that defendant was guilty of manslaughter at least, is erroneous.

DEVIN, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Parker, J.,* at April Term, 1935, of LENOIR. New trial.

This was an indictment in the usual form, N. C. Code of 1935 (Michie), section 4614, against the defendant for murder of one John Grant, on 7 January, 1935. A true bill was found. The record discloses: "Before the jury is impaneled the solicitor for the State announces and states in open court that he will not ask for a verdict of guilty of murder in the first degree, but will ask for a verdict of guilty of murder in the second degree or manslaughter, as the facts may justify."

The verdict of the jury: "The defendant is guilty of manslaughter with recommendation for mercy." Upon the verdict, judgment was duly rendered.

The defendant had been missing corn. It was a dark night, so dark that he could not tell whether the deceased was white or colored. The defendant testified, in part: "I have never been in trouble before. On this particular night, on 8 January, before that time, I had known John Grant four or five years. He and I had never had any trouble. On this particular night I was lying on the bed, had gone to bed, me and my wife were lying there reading. Later on we put the light out to go to sleep, and before long the dog begun barking. I got up and crept to my back door to see if I could see anybody, but could not see nobody, and I lay back down, and before long the dog commenced barking again. I raised the dog and was acquainted with him, and I told my wife 'that dog sees somebody.' I got up and dressed and took my single-barrel shotgun and crept out the door. I crept out in the back yard and could not see anybody. Then I crept out in a little old peach orchard and stood behind a tree, but could not see anybody. Then I walked down to the crib barn and didn't see anybody, and I crept around to the northeast end of the tobacco barn, where I kept my corn, and there was a man standing right up at the corner of the barn and I had my face right near him when I saw him, and it scared me and I hollered. He said, 'Get back, get back,' and I was getting back and he was rushing on me. It was dark and I could not see, he was fumbling and rushing me and saying, 'Get back, get back,' and I backed back a good ways and shot up in the air, trying to frighten him away. He was fumbling with his hands,

he was making towards me, I can't hardly say what he was doing, it looked like to me he was fumbling around his waist, and he scared me. I went to hollering, and my wife heard me holler. It was dark and I didn't know who it was. My wife is in the family way, expecting to be confined any day. When I shot I run back to the house and told my wife to give me a shell. I asked for another shell because I thought whoever it was that he was right on me and I hollered and told her to give me a shell. I loaded my gun and stayed in the yard a good while, and could not hear nothing, and after a while I went in the house, and then I heard something blowing and snorting, and I thought it was my cow. I had her tied to the haystack with a chain fastened around her neck. I told the fellow that stays with me would he go down with me and see what was the matter, and me and him got up and started on down there. I told him I thought it was my cow struggling down there, and I found the man a good ways before we got to the cow, lying under the tobacco barn, and I went there and examined him. The fellow with me told me to come to the police and they would tell me what to do, and I come over here as quick as I could and got Sheriff Churchill and took him back over there. This man and I had never had any trouble, never. I shot one time. I went down there three different mornings, and it looked like to me my corn was going away, and I didn't see anybody stealing it, but I missed it. There was a slab nailed over the back door and the other door that I used was fastened with a button and not locked. . . . It looked to me like from the time I first saw him, Grant had not come far toward me from where I first saw him until I went back and saw where he was lying. From where I first saw him to where he fell was something like 3 or 4 feet. From the time I first saw him until I shot I run back a long ways, about as far as from here to the window."

The court below charged the jury as follows: "The court instructs you, if you believe all the evidence in this case, of the defendant himself and the State's witnesses, beyond a reasonable doubt, you will return a verdict of guilty of manslaughter. You may retire and say how you find."

The defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court.

*Attorney-General Seawell and Assistant Attorney-General Aiken for the State.*

*Sutton & Greene for defendant.*

CLARKSON, J. From the facts and circumstances of this case, we cannot sustain the charge of the able and painstaking judge in the court below. Without discussing the evidence, as the case goes back for a

new trial, we think the question of self-defense, under all the facts and circumstances of this case, was for a jury to determine.

In *State v. Hough,* 138 N. C., 663 (667-8), we find: "It is said in 1 East, Pleas of the Crown, 271: 'A man may repel force by force in defense of his person, habitation, or property against one who manifestly intends or endeavors by violence to commit a felony, such as murder, rape, burglary, robbery, and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger, and if he kill him in so doing it is called justifiable self-defense.' The American doctrine is to the same effect. See *State v. Dixon,* 75 N. C., 275. . . . The defendant was on his own premises, engaged in his peaceful pursuits at the time the deceased advanced on him in a manner giving unmistakable evidence of his purpose to do the defendant bodily harm. How was the defendant expected to receive him? In the oft-quoted language of *Judge Pearson* in *State v. Floyd,* 51 N. C., 392, 'One cannot be expected to encounter a lion as he would a lamb,' and the measure of force which the defendant was permitted to use under such circumstances ought not to be weighed in 'golden scales.'"

In *State v. Holland,* 193 N. C., 713 (718), speaking to the subject, is the following: "The first law of nature is that of self-defense. The law of this State and elsewhere recognizes this primary impulse and inherent right. One being without fault, in defense of his person, in the exercise of ordinary firmness, has a right to invoke this law and kill his assailant, if he has reasonable ground for believing or apprehending that he is about to suffer death or great or enormous bodily harm at his hands. The danger or necessity may be real or apparent. It is for the jury, and not the party setting up the plea, to determine, under all the facts and circumstances, the reasonableness of the grounds for the belief or apprehension of the real or apparent danger or necessity. The mere fact that a man believes or apprehends that he is in present, immediate, or imminent danger of death or great bodily harm, is not sufficient to justify the taking of the life of a human being, but there must be reasonable ground for the belief or apprehension—an honest and well-founded belief or apprehension at the time the homicide is committed. . . . (Citing authorities.) In *S. v. Hand,* 170 N. C., at p. 706, it is said: 'It is well-settled law that when the killing with a deadly weapon has been proved or admitted, the burden is on the prisoner to show excuse or mitigation. *S. v. Gaddy,* 166 N. C., 341; *S. v. Yates,* 155 N. C., 450; *S. v. Rowe, ibid.,* 436; *S. v. Simonds,* 154 N. C., 197; *S. v. Brittian,* 89 N. C., 481.'" *State v. Turnage,* 138 N. C., 566 (569-570); *State v. Gregory,* 203 N. C., 528.

"The law of England," said Sir Matthew Hale, "hath afforded the best method of trial that is possible for this and all other matters of fact,

namely, by a jury of twelve men all concurring in the same judgment, by the testimony of witnesses *viva voce* in the presence of the judge and jury, and by the inspection and direction of the judge." 1 Pleas of the Crown, 33. "The trial by jury," declared Blackstone, "ever has been, and I trust ever will be, looked upon as the glory of the English Law.". It is "the most transcendent privilege which any subject can enjoy, or wish for," he continues, "that he cannot be affected either in his property, or his liberty, or his person, but by the unanimous consent of twelve of his neighbours and equals." 3 Comm., 379.

. For the reasons given, there must be a

New trial.

DEVIN, J., took no part in the consideration or decision of this case.