The defendant was tried on an indictment in which he was charged with the murder of John Brascus Webb. C. S., 4614, and C. S., 4642.
When the action was called for trial, the solicitor for the State announced to the court that he would not contend that on the evidence which he would offer for the State the defendant is guilty of murder in the first degree, but would contend that the defendant is guilty of murder in the second degree or of manslaughter, as the jury should find the facts to be from all the evidence. The defendant entered a plea of not guilty; he relied upon his plea of self-defense.
The evidence at the trial tended to show that about 10 o'clock on a Saturday night in August, 1936, at a filling station in Johnston County, which was owned and operated by Willie Parker, the defendant Brantley Thornton shot and killed the deceased, John Brascus Webb; that at the time he shot and killed the deceased the defendant was at the filling station, engaged in the performance of his duties as an employee of the owner and proprietor, Willie Parker; and that the deceased, after he had been repeatedly requested by both Willie Parker and the defendant to leave the filling station, because of his intoxicated condition, did so, but within a short time returned to the filling station, and remained there until he was shot and killed by the defendant.
The defendant Brantley Thornton, as a witness in his own behalf, testified as follow:
"I knew John Brascus Webb. I knew his reputation as a dangerous and violent man. It was bad.
"I am 24 years of age, and am a married man. I have a wife and two children. During the year 1936 I was employed by Willie Parker *Page 415 
to work at his filling station in Johnston County. I was at work at the filling station on the Saturday night in August, 1936, when John Brascus Webb was shot and killed. I had been to Benson. I got back to the filling station about 9 o'clock that night. As I drove up, I saw John Brascus Webb leaving in his automobile. I did not speak to him, nor did he speak to me. We had had no trouble that night, or at any previous time. After he had driven away from the filling station, in a short time he came back and said that his automobile had `knocked off' on him. He wanted someone at the filling station to go with him to his automobile and help him crank it. There were eight or ten men standing about the filling station. Some of them went with him to his automobile and tried to start it. After they had been gone about ten or fifteen minutes, John Brascus Webb came back to the filling station and asked me to go with him to his automobile. He had been drinking, was intoxicated, and was staggering around. I told him that I could not leave the filling station. He said: `God damn you, you don't want to go.' He turned from me and called Willie Parker. Willie Parker told him that he could not help him with his automobile — that he did not have a bumper. He said to Willie Parker: `You do not want to help me.' Willie then told him to go home — that he was in no condition to drive his automobile, if he could get it started. He kept hanging around, cursing and worrying everybody at the filling station. Willie Parker left the filling station, and went home. After Willie Parker left, Webb also left. He went toward his automobile, which was a short distance from the filling station, on the highway. After he had been gone about ten minutes, he came back to the filling station and asked me where Willie Parker was. I told him that Willie Parker had gone home. He then went off towards Willie Parker's home. He soon came back to the filling station. There was no one with me then except John Blackman, who had come to the filling station after Willie Parker left. He and I were standing under the shed, talking, when Webb came back from Willie Parker's home. He again asked me to go with him to his automobile and help him start it. I told him that I had nothing to pull the automobile with, and that I could not leave the filling station. While Webb and I were talking, Willie Parker came back to the filling station. Webb asked Parker again to help him with his automobile. Willie Parker told him that he was fixing to leave the filling station, and could not help him with his automobile. We had closed the store at the filling station for the night but had not locked the front door. Willie Parker soon left the filling station, and Webb again went to his automobile. At this time Luther Lee drove up in his automobile. Willie Parker got into Lee's automobile and called me. I went to Lee's automobile and stood there for a few moments talking with Parker and Lee John *Page 416 
Brascus Webb came back from his automobile while we were talking. He was then cursing everybody and everything in sight. He was drunk.
"When I left Luther Lee's automobile, I went toward the store. I squatted down on the cement near the oil drum. Webb came up and sat down between John Blackman and Melvin Hudson, who were sitting on a bench at the filling station. He continued to curse. I said to him: `You had better leave here and go where your automobile is. Willie Parker has told you to leave three times. I want you to leave and stay away from here. We don't want you here. Leave and stay away.' As I said this to him, he reached his hand into his hip pocket, and started toward me. I stepped back, reached down and picked up from the ground a lightwood knot, which we used about the filling station. When I rose up, Webb came toward me again. I struck him on the left shoulder with the lightwood knot. He then turned and went off across the road from the filling station. Melvin Hudson got up from the bench on which he had been sitting and started after Webb. I called to him: `Come back here. We are not going to have any trouble here tonight.' He came back and I went toward the store. When I got to the store, John Brascus Webb was coming back to the filling station. He was cursing and saying: `Somebody is going to meet his doom tonight.' I went into the store and got a gun, which I put in my pocket. I did this for my protection. I knew John Brascus Webb's reputation. I was afraid of him when he was drinking.
"When I came out of the store I went to my right and started to sit down. When I got half-way down, Webb got off the bench on which he was sitting, and struck at me with a knife. Laster Smith was sitting on the bench. When Webb brushed by him, he got up and ran to his left. I turned to my right and Webb was right after me. I ran around the corner into a jam made by an automobile which was standing there. I turned to Webb and said: `Don't come any closer to me; if you do, I will shoot you.' He made another step and I shot. At that time he had his arm up and was coming toward me. The first bullet hit him in his left side, but did not stop him. He kept coming toward me. He threw up his left arm and I shot him a second time. He was then about three feet from me.
"When I ran around the corner, I did not know I was going to get into a jam. I went around there to get out of Webb's reach. John Blackman made a lunge at Webb as he was going around the corner after me. When I shot the second time, Blackman said: `Brantley, you have done enough.' Webb had his knife in his right hand when I shot the second time. After I shot, he shut his knife, and walked back, saying: `I'll see you in the morning.' He walked around a post, began to stagger, and soon fell on his face. After Webb died, I told Willie Parker to go *Page 417 
after the sheriff. I remained at the filling station until the sheriff came and took me into custody."
Evidence offered by the defendant tended to show that the defendant is a man of good character, and that the reputation of the deceased, as a dangerous and violent man when he was intoxicated, was bad.
The testimony of the defendant as a witness in his own behalf was corroborated by witnesses for both the State and the defendant.
In its charge the court instructed the jury as follows:
"A man is permitted to kill in self-defense. He may do so whenever it is necessary for him to do so in order to prevent his own death or his great bodily harm. He may do so when it is not actually necessary if he believes it to be necessary, and he has reasonable grounds for that belief, but the jury and not the defendant are the judges of whether or not his grounds are reasonable.
"I further instruct you, gentlemen of the jury, that a man cannot invoke the right of self-defense if there be reasonable opportunity to retreat and avoid the difficulty.
"The State contends in this case that the defendant had all the county to retreat in; that he could have gone into the store; that instead of getting the pistol and arming himself, and coming out to meet this drunken man he could have locked the front door from the inside, gone out the back way, and thus avoided the shooting of the deceased.
"The State contends that the deceased was drunk, that his reason was dethroned by the use of alcohol, and that when the defendant struck him with the lightwood knot, he immediately went off, did not resist the defendant, or offer to fight him. The State contends that the defendant started the fight, and that you ought to so find.
"This is the law, gentlemen of the jury, and I instruct you that when a man provokes a fight by unlawfully striking another and in the progress of the fight kills his adversary, he will be guilty of manslaughter, at least, though he thought at the precise time of the killing that it was necessary for him to kill in order to save his own life. In other words, if a man starts a fight, and then afterwards it is necessary to kill in order to save his own life, he would be guilty of manslaughter, at least, because he started the fight.
"I instruct you, gentlemen of the jury, that the following is the law: When a man enters a fight willingly, that is to say, voluntarily, aggressively, without legal excuse, he cannot invoke the doctrine of self-defense until he has quit the fight and given his adversary notice that he has quit."
The defendant in apt time excepted to these instructions.
There was a verdict that defendant is guilty of manslaughter. The jury recommended the defendant to the mercy of the court. *Page 418 
It was ordered and adjudged by the court that the defendant be confined in the State's Prison for a term of not less than ten or more than twelve years.
The defendant appealed to the Supreme Court, assigning numerous errors in the trial.
The evidence for the defendant at the trial of this action, if believed by the jury, showed that the defendant did not enter into a fight with the deceased willingly and unlawfully, either at the time the defendant struck the deceased with the lightwood knot which he had picked up from the ground as the deceased was advancing upon him, in a threatening attitude, or, subsequently, when the defendant shot and killed the deceased, who was again advancing upon the defendant, with an open knife in his right hand. On each occasion the deceased, and not the defendant, was the aggressor. The defendant had not provoked the assault upon him by the deceased, and was free from fault. All the evidence showed that at the time of the homicide the defendant was at a place where he had a right and where it was his duty as an employee to be. The deceased, after he had left the filling station, in compliance with the repeated requests of the owner and of the defendant, returned and, as the defendant was about to sit down on a bench at the filling station, assaulted him, with a knife. The defendant did not shoot the deceased until he had warned him that he would do so if he continued to advance upon him with the knife in his hand.
An examination of the charge of the court to the jury fails to disclose any instruction as to the law applicable to the facts as shown by the evidence for the defendant. The instructions as to the law of self-defense, while correct as general propositions, were not in compliance with the mandatory provisions of the statute. C. S., 564.
In S. v. Blevins, 138 N.C. 668, 50 S.E. 763, it is said: "It has been established in this State by several well considered decisions that where a man is without fault, and a murderous assault is made upon him — an assault with intent to kill — he is not required to retreat, but may stand his ground, and if he kill his assailant and it is necessary to do so in order to save his own life or protect his person from great bodily harm, it is excusable homicide, and will be so held (S. v.Harris, 46 N.C. 190; S. v. Dixon, 75 N.C. 275; S. v. Hough, 138 N.C. 663); this necessity, real or apparent, to be determined by the jury on the facts as they reasonably appeared to him." *Page 419 
The failure of the court to instruct the jury in accordance with this well settled principle (S. v. Bost, 192 N.C. 1, 133 S.E. 176) was error, for which the defendant is entitled to a new trial. It is so ordered.
New trial.