Criminal prosecution, tried upon indictment charging the defendants with the murder of one Ratcliff Robinson. The defendants pleaded not *Page 275 
guilty and relied upon a plea of self-defense. The defendant Wendell Reed further pleaded that he merely undertook to prevent a felonious assault.
The evidence for the State tends to show that: The deceased, Ratcliff Robinson, aged 31 years, died on 20 July, 1937, as the result of an injury to his head received on the night of 17 July, 1937, in an altercation with the defendants, Harley Robinson, aged 52 years, first cousin of the deceased, and Wendell Reed, aged 26 or 27, stepson of defendant, Harley Robinson.
Harley Robinson and his wife, the mother of Wendell Reed, and Wendell Reed lived on Robinson's farm on Beaver Dam Creek, about three miles from Canton. He worked for the Champion Fibre Company in Canton. The deceased, Ratcliff Robinson, worked for and on the farm of Harley Robinson, but resided at Pearson Clark's about a quarter of a mile away. Harley Robinson's house was located several hundred yards from the community public highway. A private road connected the house with the highway.
On the afternoon of 17 July Wendell Reed and Ratcliff Robinson were at the highway where the private road enters, drinking whiskey which Wendell Reed had hidden near there. The two were together in the neighborhood until the time to do the evening chores about the house of Harley Robinson. Between 7 and 7:30 o'clock Harley Robinson, Wendell Reed, and Ratcliff Robinson were engaged in an altercation at the junction of the said private road and highway. The brothers of Ratcliff Robinson testified that they saw Harley Robinson hit him on the head with a pistol; that on their approaching Harley Robinson and Wendell Reed, who had Ratcliff Robinson down on the ground, got up off of him. The brothers examined the head of Ratcliff Robinson and saw one bruise. He then left there, going in the direction of Pearson Clark's. The brothers went fishing and on returning about 11:30 that night were informed by Harley Robinson that some one was lying in the road near his rye stacks, and offered the suggestion that it might be Ratcliff. He was found near there in an unconscious condition, taken to the doctor that night, then to the hospital next morning, and died Tuesday night.
Through a deputy sheriff the State offered declaration of Harley Robinson as to the facts and circumstances under which the altercation took place, and, among other things, that he had not seen Ratcliff Robinson after the altercation until he saw him lying in the road, and that he did not disturb him and did not know then it was he.
The State contended below that after the altercation, which the brothers of Ratcliff Robinson witnessed in part, the defendants later met the deceased and beat him up and left him lying in the road. *Page 276 
On the other hand the defendants offered evidence tending to show that the only altercation took place after 8 o'clock. Defendant Harley Robinson testified: "I knew Ratcliff Robinson; I had known him all of his life. Prior to 17 July, Ratcliff Robinson was working with me and was taking his noon meals with me; he was doing farm work. He did the milking, and fed, and plowed corn, and such as that. He spent his nights over at Mr. Pearson Clark's. I live about 200 yards from the old home place of Ratcliff Robinson. His mother did live there; she is dead now; that is the old home place. . . . This was on Saturday; I came in from work about 5 o'clock. As I went home I left the highway going up home; as I passed over the hill Ratcliff Robinson, Wendell Reed, and Reed Robinson were sitting by the side of the road. . . . It was about 7 o'clock when I next saw Ratcliff, when he drove his cows to the milk gap. He milked that evening, then he fed the hogs. He came on through the yard and spoke a few words and he said, `I got your rye all up,' and I said, `That is fine,' and he said, `I must go,' and I said, `Don't hurry, go in and spend the night,' and he said, `I have to go to town, I am going with Reed and Paul Sorrels and Canie to get a haircut,' and he went on. . . . The next time I saw him was about an hour later. . . . Wendell Reed was with him at that time. It was about 8 o'clock, probably five minutes after; I think it was about 8 o'clock when he left the house. It was getting dusk when I got to the road. I had started across to the far end of my field to look after a cow and calf. . . . I saw Ratcliff standing in the middle of the highway. . . . I saw the light of a car coming and I said to the boys, `Boys, you had better look out and get out of the way, you might get run over.' When I said that to the boys Wendell moved out of the way and Ratcliff stood still where he was, and as the car passed it couldn't go down the right-hand side, its right-of-way, it cut to the left and it looked like it nearly hit him and I said, `Boy, you are a fool.' He didn't say anything and he grabbed up a rock and here he come into my face and he said, `I am going to burst your G — d — brains out,' and I said, `Rat, what is the matter with you, I didn't mean to make you mad'; and he said `By G — , I am going to get you,' and Wendell came up about that time and he said, `Rat, that is nothing to get mad about, let's forget about it,' and he dropped his rock down, and I said, `I am in a hurry, I am going to see about my cow, I must go,' and I started to make a step toward the road and he ran in front of me and grabbed me by the shirt collar and said, `You are not going anywhere,' and he grabbed his knife and felt of the knife like he was feeling how sharp it was and he began to whet his knife, and I knew I was going to get cut, and the thought struck me maybe I could back off and go back home, and when I started backing off it made him that much madder, and he *Page 277 
gritted his teeth and here he come and I got into the wire fence that comes down my lane; this happened at the mouth of my lane, in eight or ten feet of the road, and when he got me into the fence he said, `I am going to cut your G — d — g — out, you s.o.b.,' and he drawed back to strike me and I gave into the fence and he struck me, cut me across here and hit the seam of my pants and I gave the knife a shove and I felt that I was cut and I dropped on my right knee and got a rock and I think he thought he had cut me down; he stood there looking and I started to raise up and here he come at me with the knife, and when he got in reach of me I hit him somewhere above the car in the side of the head with a rock and knocked him down and he caught on his left elbow and he reared up and come at me again, and the second time I struck at him I struck over him. I don't think I hit him that time, and he whirled around and I thought I could catch him and take the knife away from him, and directly we fell and he fell kind of on top of me, and I still held on to the hand he had the knife in and I called Wendell; . . . and Wendell come and broke the blade off of the knife trying to get the knife, and Wendell took hold of me by the shoulder and by the time I got about half straight he come at me with the butt of the blade and down I come, and he struck me two or three licks in the face, and I come up with him on my back and he slid off and he jumped back about to where he first cut me and he opened the little blade of the knife and said, `G — d — you, I will get you,' and I got a rock and hit him again in the top or back of the head, I don't know which, and I knocked him to his knees that time, and when he come the next time he come at such an angle and I thought I will not hit you any more, I will catch you and maybe I can hold you, and we got to scuffling and Wendell took the knife away from him. . . . I hit him because I didn't want him to cut me all to pieces, to save my life, I didn't want to do it, I had to do it, and I told him I didn't want to; I had no ill will, malice or grudge against him; he and I have always been friends. . . . I knew the general reputation of Ratcliff Robinson as to whether he was a dangerous and violent man; when he was under the influence of whiskey he didn't have any friends; he didn't respect anybody. I wouldn't say that he was under the influence of whiskey on this occasion, I didn't smell any on him; I couldn't swear he was drinking; he was either crazy mad or drunk, I don't know which."
The testimony of Wendell Reed as to the altercation was substantially the same as that of Harley Robinson, differing only in matters of detail. He further testified: "I never had any trouble with this boy, never had a word with him; I had always been friendly with him. Me and him run together all the time. I didn't touch him only when I took the *Page 278 
knife away from him and pulled him up. I guess I have known the deceased for about 20 years; I had been friendly with him all this time. I did not have any ill will or malice or grudge against him. . . . I was trying topart them. I didn't have anything to do with it."
Verdict: Guilty of manslaughter.
Judgment: As to Harley Robinson not less than three nor more than seven years, and as to Wendell Reed not less than eighteen months nor more than five years, each at hard labor in the State's Prison.
The defendants appealed to the Supreme Court and assigned error.
The record on this appeal reveals error affecting substantive rights of the defendants, and entitles each of them to a new trial.
The evidence introduced is sufficient to justify and require the submission to the jury under proper charge of the court, as to the defendant Harley Robinson, the plea of self-defense, and as to the defendant Wendell Reed, the pleas of self-defense, fighting in the necessary defense of his stepfather, and the right and duty of interfering as a private citizen to prevent a felonious assault. In the light of respective pleas the defendants insist that in the charge to the jury the court below erred in two respects: (1) In charging that "if he engaged in the controversy, whether a fist fight or what not, freely and voluntarily, or if he used language calculated to bring on a controversy and it does so, the law says he cannot plead the perfect self-defense, because to recognize his right to do so would make him the author of his own wrong," and (2) in failing "to state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon" as required by statute. C. S., 564. These assignments are well taken.
The intentional killing of a human being with a deadly weapon implies malice and, if nothing else appears, constitutes murder in the second degree. When this implication is raised by an admission or proof of the fact of killing, the burden is on the defendant to show to the satisfaction of the jury facts and circumstances sufficient to reduce the homicide to manslaughter or to excuse it. S. v. Capps, 134 N.C. 622, 46 S.E. 730;S. v. Quick, 150 N.C. 820, 64 S.E. 168; S. v. Gregory, 203 N.C. 528,166 S.E. 387; S. v. Terrell, 212 N.C. 145, 193 S.E. 161. *Page 279 
The plea of self-defense or excusable homicide rests upon necessity, real or apparent. In S. v. Marshall, 208 N.C. 127, 179 S.E. 427, the principle is clearly stated: "The decisions are to this effect:
"1. That one may kill in defense of himself, or his family, when necessary to prevent death or great bodily harm. S. v. Bryson, 200 N.C. 50,156 S.E. 143; S. v. Bost, 192 N.C. 1, 133 S.E. 176; S. v.Johnson, 166 N.C. 392, 81 S.E. 941; S. v. Gray, 162 N.C. 608,77 S.E. 833.
"2. That one may kill in defense of himself, or his family, when not actually necessary to prevent death or great bodily harm, if he believes it to be necessary and has a reasonable ground for the belief. S. v. Barrett,132 N.C. 1005, 43 S.E. 832.
"3. That the reasonableness of this belief or apprehension must be judged by the facts and circumstances as they appeared to the party charged at the time of the killing. S. v. Blackwell, 162 N.C. 672, 78 S.E. 316.
"4. That the jury and not the party charged is to determine the reasonableness of the belief or apprehension upon which he acted. S. v.Nash, 88 N.C. 618."
For application of the principle, see S. v. Barrett, supra; S. v. Cox,153 N.C. 638, 69 S.E. 419; S. v. Blackwell, supra; S. v. Johnson,supra; S. v. Hand, 170 N.C. 703, 86 S.E. 1005; S. v. Robinson,188 N.C. 784, 125 S.E. 617; S. v. Waldroop, 193 N.C. 12, 135 S.E. 165;S. v. Bryson, 200 N.C. 50, 156 S.E. 143; S. v. Marshall, supra; S. v.Koutro, 210 N.C. 144, 185 S.E. 682; S. v. Reynolds, 212 N.C. 37,192 S.E. 870; S. v. Terrell, supra; S. v. Holland, 193 N.C. 713,138 S.E. 8; S. v. Glenn, 198 N.C. 79, 150 S.E. 663; S. v. Kirkman,208 N.C. 719, 182 S.E. 498.
In S. v. Barrett, supra, it is stated: "The defendant's conduct must be judged by the facts and circumstances as they appeared to him at the time he committed the act, and it should be ascertained by the jury, under evidence and proper instructions of the court, whether he had a reasonable apprehension that he was about to lose his life or to receive enormous bodily harm. The reasonableness of his apprehension must always be for the jury, and not the defendant, to pass upon, but the jury must form its conclusion from the facts and circumstances as they appeared to the defendant at the time he committed the alleged criminal act. If his adversary does anything which is calculated to excite in his mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assault him and to take his life or to inflict great bodily harm, it would seem that the law should permit him to act in obedience to the natural impulse of self-preservation and to defend himself against what he supposes to be a threatened attack, even though it turns out afterwards that he was mistaken: Provided, always, the jury *Page 280 
finds that his apprehension was a reasonable one, and that he acted with ordinary firmness."
In S. v. Blevins, 138 N.C. 668, 50 S.E. 763, it is said: "Where a man is without fault, and a murderous assault is made upon him, an assault with intent to kill, he is not required to retreat, but may stand his ground, and if he kill his assailant and it is necessary to do so in order to save his own life or protect his person from great bodily harm, it is excusable homicide, and will be so held." S. v. Lucas, 164 N.C. 471,79 S.E. 674; S. v. Ray, 166 N.C. 420, 81 S.E. 1087; S. v. Bost, supra;S. v. Hardee, 192 N.C. 533, 135 S.E. 345; S. v. Waldroop, supra; S. v.Dills, 196 N.C. 457, 146 S.E. 1; S. v. Thornton, 211 N.C. 413,190 S.E. 758; S. v. Terrell, supra.
In S. v. Johnson, 184 N.C. 637, 113 S.E. 617, Walker, J., speaking to the question for the Court, said: "It all comes to this, that if the jury finds that the prisoner did not fight willingly, except in the sense that he was compelled to do so in order to defend himself, and was himself without fault, and he was feloniously or murderously attacked by the deceased, so that it reasonably appeared to him and he believed that his life was in danger, or that he was about to receive great bodily harm, his right of self-defense was in such case, if found by the jury, complete and justifiable, and if he slew his adversary under such circumstances the jury should acquit him."
To have the benefit of self-defense the assaulted party must show to the satisfaction of the jury that he is free from blame in the matter, that the assault upon him was with felonious purpose, and that he took life only when it reasonably appeared to him to be necessary to protect himself from death or great bodily harm. S. v. Blevins, supra; S. v. Lucas, supra; S. v.Dove, 156 N.C. 653, 72 S.E. 792.
1. The question arises, Were the defendants or either of them without fault in bringing on the difficulty? The court, in the portion of the charge to which exception is taken, told the jury that he would be at fault "if he used language calculated to bring on a controversy and it does so." This is error. The test, did he use language calculated and intended to bring on a fight and a fight ensues. Speaking of an affray, in the case ofS. v. Perry, 50 N.C. 9, the court said: "If one person, by such abusive language toward another as is calculated and intended to bring on a fight, induces that other to strike him he is guilty, though he may be unable to return the blow." S. v. Robbins, 78 N.C. 431; S. v. Davis, 80 N.C. 351;S. v. Fanning, 94 N.C. 940; S. v. Rowe, 155 N.C. 436, 71 S.E. 332; S.v. Lancaster, 169 N.C. 284, 84 S.E. 529; S. v. Crisp, 170 N.C. 785,87 S.E. 511.
In S. v. Rowe, supra, a homicide case, the Court said: "Whether language is provocative or not cannot always be determined by a mere consideration of the words by themselves. It is sometimes necessary, in *Page 281 
order to ascertain the meaning of intention of the speaker, or the probable effect of what is said upon the person to whom he has spoken, that we should view them in their proper setting — the circumstances and surroundings of the parties, their previous relations to each other, and the state of their feelings. What is said by a friend may pass unnoticed, while if the same words are uttered by an enemy they are like a spark, though small it be, falling into powder, and the explosion quickly follows. In such a case a single word, though apparently innocent and harmless, will arouse the human passions of anger and resentment." And, continuing, "The court properly instructed the jury to consider the evidence and decide whether or not the words were calculated and intended to bring on a fight."
In S. v. Crisp, supra, Hoke, J., said: "In some of the decisions on the subject it has been stated as a very satisfactory test that this right of perfect self-defense will be denied in cases where, if a homicide had not occurred, a defendant would be guilty of a misdemeanor involving a breach of the peace by reason of the manner in which he had provoked or entered into a fight. Under our decisions such a position would exist: (a) Whenever one has wrongfully assaulted another or committed a battery upon him; (b) when one has provoked a present difficulty by language or conduct towards another that is calculated and intended to bring it about. . . . . And, in this connection, it is properly held that language may have varying significance from difference of time and circumstances, and the question is very generally for the determination of the jury."
2. The charge failed to advert to and explain the law with reference to substantive rights of each of the defendants. As to both defendants the court below declared the law as to when they could not plead the perfect self-defense. Having done so, he should have gone further and told the jury that the right of self-defense may be restored to one who has started a fight, or entered into it willingly, by quitting in good faith and giving his adversary notice of such action on his part. S. v. Pollard,168 N.C. 116, 83 S.E. 167; S. v. Kennedy, 169 N.C. 326, 85 S.E. 42:S. v. Bost, 189 N.C. 639, 127 S.E. 926.
As to the defendant Wendell Reed, the court failed to charge the law with respect to both (a) his right to fight in the necessary defense of his stepfather, and (b) his right and duty as a private citizen to interfere to prevent a felonious assault. Each right is recognized in the decisions of this Court.
(a) In S. v. Johnson, 75 N.C. 174, Bynum, J., said: "The proposition is true that the wife has the right to fight in the necessary defense of the husband, the child in defense of his parent, the servant in defense of the master, and reciprocally; but the act of the assistant must have the same construction in such cases as the act of the assisted party *Page 282 
should have had if it had been done by himself, for they are in a mutual relation one to another." S. v. Brittain, 89 N.C. 482, at p. 504; S. v.Bullock, 91 N.C. 614; S. v. Greer, 162 N.C. 640, 78 S.E. 310;Roberson v. Stokes, 181 N.C. 59, 106 S.E. 151; S. v. Maney, 194 N.C. 34,138 S.E. 441.
In S. v. Dills, 196 N.C. 457, 146 S.E. 1, it is stated: "Allen Dills contends that he shot the deceased in self-defense and his wife contended that she was engaged in defending her husband. Whether she aided him in an unlawful assault or only in his lawful defense is a matter which should have been explained and submitted to the jury." S. v. Cox, 153 N.C. 638,69 S.E. 419; S. v. Greer, supra; S. v. Gaddy, 166 N.C. 341,81 S.E. 608.
(b) If the defendant Wendell Reed had a well-grounded belief that a felonious assault was about to be committed on the defendant Harley Robinson, he had the right and it was his duty as a private citizen to interfere to prevent the supposed crime. The principle of law is well settled in this State. S. v. Rutherford, 8 N.C. 456; S. v. Roane,13 N.C. 58; S. v. Clark, 134 N.C. 698, 47 S.E. 36.
The failure of the court to instruct the jury on substantive features of the case arising on the evidence is prejudicial error. This is true even though there is no special prayer for instructions to that effect. S. v.Merrick, 171 N.C. 788, 88 S.E. 501; S. v. Bost, supra; S. v. Thornton,supra; School Dist. v. Alamance County, 211 N.C. 213, 193 S.E. 31.
As the case goes back for a new trial for the errors treated, other exceptions upon which defendants rely need not be considered. S. v.Stevenson, 212 N.C. 648, 194 S.E. 81, and cases therein cited.
For the reason stated the defendants are entitled to a
New trial.