STATE v. HOUGH.

(Filed May 2, 1905.)

*Homicide—Self-Defense—Assaults with and without Felonious Intent—Rights of Person Assaulted.*

1. A charge that if the jury believed the evidence of the defendant, he would at least be guilty of manslaughter, excludes any idea of self-defense and was erroneous, if, taking the defendant's testimony in its most favorable aspect, an inference of self-defense might have been reasonably drawn therefrom by the jury.

2. The fact that the defendant procured a pistol on the morning of the homicide, is not conclusive evidence of an intent to unlawfully use if an emergency arose, where it appears that the deceased had threatened to kill the defendant and there was a great disparity in the size and strength of the two men.

3. If an assault be committed under such circumstances as to naturally induce the defendant to believe that the deceased was capable of doing him great bodily harm, and intended to do it, then the law will excuse the killing, because any man who is not himself legally in fault has the right to save his own life, or to prevent enormous bodily harm to himself.

4. There is a distinction between an assault with felonious intent, and assault without felonious intent; in the former a person attacked is under no obligation to fly, but may stand his ground and kill his adversary, if need be; in the latter, he may not stand his ground and kill his adversary, if there is any way of escape open to him.

INDICTMENT against W. L. Hough, for the murder of one George Hartsell, heard by *Judge W. R. Allen* and a jury, at the October Term, 1904, of the Superior Court of CABARRUS County. The prisoner was convicted of manslaughter, and from the judgment of the court, he appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*Montgomery & Crowell* for the prisoner.

BROWN, J. His Honor charged the jury that if they believed the evidence of the defendant he would at least be guilty of manslaughter, to which the defendant excepted. It follows, therefore, from the charge of His Honor, that any idea of self-defense was excluded, and if, taking the defendant's testimony in its most favorable aspect, an inference of self-defense might have been reasonably drawn by the jury from the testimony of the defendant, then there was error in the charge of the court.

The defendant's wife testified that the deceased made an improper proposal to her in the field where she was at work; that he was her step-father; that she declined, and the deceased went off and in a short while returned and renewed the proposition, and said: "If you don't consent, tell your husband I am going to kill him;" that she told her husband of this conversation. The defendant then testified in his own behalf, as follows: "My wife told me that night what the deceased had said. I went next morning and borrowed a pistol. That evening I was at work in my field when deceased came to me and wanted to exchange his horse for mine to work to the reaper. I told him I wanted a settlement. He went off and returned late in the evening and asked where Mary, my wife, was. I told him I did not know, and you are the cause of her being gone. He started towards me, rolling up his sleeves. I told him to stand off; he kept advancing and I shot, and gave back four cotton rows. He kept advancing

and I shot four times as I retreated. He got near enough to grab at me. The last time I shot he stopped. I was twenty-five steps from my house. When I began to shoot he was about seven cotton rows from me. At the time I shot him he was approaching me rolling up his sleeves. I saw no weapon. I saw him go to the house from the field and come back through the field to me, and I thought he had gone to his house and got something. He looked mad and showed fight. I knew he was a very strong, large, muscular man, weighing about two hundred pounds. I weigh one hundred and twenty-two pounds. The land I lived on and worked belonged to the deceased. I did not have the pistol when he came to the field the first time. The wounds were the cause of his death." Thomas Bost testified as to the dying declarations of the deceased, as follows: "Hartsell said he was going to die. Said he was willing to suffer the punishment. That he would not hurt a hair on Hough's head. Said he thought Hough justifiable in what he did." There was also evidence tending to prove that the general character of the deceased was bad for violence, and that the defendant knew of it; that he was a very large and powerful man physically, very muscular, and weighing about two hundred pounds, and that the defendant was a very small, weakly man, weighing one hundred and twenty-two pounds, and of excellent character.

It is contended by the State that the fact that the defendant procured a pistol on the morning of the homicide is to be taken as conclusive evidence of an intent on the part of the defendant to unlawfully use the pistol if an emergency arose, and that he was in fault in entering into the combat with a deadly weapon. This would probably be a legitimate argument, but for the fact that the testimony discloses that the deceased threatened to kill the defendant; that he told the defendant's wife to tell him so, and in view of the fact that there was a great disparity in the size and strength of the

two men, it does not follow necessarily that the defendant's purpose was to do more than defend himself. The defendant's testimony, if believed by the jury to be true, establishes the following facts: That the defendant was at his own home attending to his business; that the deceased came to the defendant's house; that he was a very powerful, violent and dangerous man; that he had threatened to kill the defendant, and told the defendant's wife to tell him so; that at the time of the shooting he was advancing on the defendant in a striking attitude; the defendant orders him to stop. It is a fair inference to suppose that the defendant thought the deceased was advancing upon him for the purpose of carrying into execution the threat he had made. The defendant retreats and gives back, although he is on his own premises. This powerful and dangerous man continues to advance, rolling up his sleeves; one shot does not stop him; he did not stop until the fourth and fatal shot.

It is undoubtedly true that if two engage in a fight upon a sudden quarrel, one being unarmed and the other armed, and one kills the other with a deadly weapon, it is at least manslaughter. *State v. Curry,* 46 N. C., 280. But if the defendant's evidence is to be believed, this was not a fight upon a sudden quarrel. He had a right to suppose that the deceased was advancing on him for the purpose of carrying into execution his previous threats, and if under such circumstances the jury should find that the defendant had reasonable ground to believe that the deceased intended to do him great bodily harm, then he had a right to defend himself, and if the jury should find that the use of a deadly weapon under such circumstances, considering the enormous difference in the size and strength of the two men, was necessary in order to make his defense effectual, then the defendant would not be guilty. If the assault was committed under such circumstances as would naturally induce the defendant to believe that the deceased was capable of doing him great

bodily harm and intended to do it, then the law would excuse the killing, because any man who is not himself legally in fault has the right to save his own life or to prevent enormous bodily harm to himself. *State v. Lipscomb,* 134 N. C., 692. The general rule is that "one may oppose another attempting the perpetration of a felony, if need be, to the taking of the felon's life, as in the case of a person attacked by another intending to kill him, who thereupon kills his assailant, he is justified." 2 Bishop's Criminal Law, sec. 332. There is a distinction made by the text-writers on criminal law, which seems to be reasonable and supported by authority, between assaults with felonious intent and assaults without felonious intent. "In the latter, the person assaulted may not stand his ground and kill his adversary if there is any way of escape open to him, though he is allowed to repel force with force and give blow for blow. In the former class, where the attack is made with murderous intent, the person attacked is under no obligation to fly, but may stand his ground and kill his adversary if need be." 2 Bishop's Criminal Law, sec. 6333, and cases cited. It is said in 1 East, Pleas of the Crown, 271: "A man may repel force by force in defense of his person, habitation or property against one who manifestly intends or endeavors by violence to commit a felony, such as murder, rape, burglary, robbery and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger, and if he kill him in so doing it is called justifiable self-defense." The American doctrine is to the same effect. See *State v. Dixon,* 75 N. C., 275.

It is true there is no evidence that the deceased was armed with a deadly weapon, at least none was exhibited, but the evidence does show that the deceased had sent word to the defendant that he intended to kill him and the defendant had a right to suppose that the deceased was endeavoring to carry out his threat and was prepared to do it. Then, again, the

evidence shows there was an enormous disparity in the relative strength and power of the defendant and deceased, the one being a weakly, delicate man of very small stature; the other, in comparison, being a giant of violent nature, and evidently capable of either killing the defendant or doing him great bodily harm without the aid of a weapon. The defendant was on his own premises, engaged in his peaceful pursuits at the time the deceased advanced on him in a manner giving unmistakable evidence of his purpose to do the defendant bodily harm. How was the defendant expected to receive him? In the oft quoted language of *Judge Pearson* in *State v. Floyd,* 51 N. C., 392, "One cannot be expected to encounter a lion as he would a lamb," and the measure of force which the defendant was permitted to use under such circumstances ought not to be weighed in "golden scales."

We think the case should have been submitted to the jury with appropriate instructions by the court.

New Trial.