## STATE v. TED TERRELL.

(Filed 13 October, 1937.)

**1. Homicide § 5—**

Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation.

**2. Homicide § 7—**

Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation.

**3. Homicide § 16—**

Where an intentional killing of a human being with a deadly weapon is admitted or proven, the law implies malice, and nothing else appearing, the crime is murder in the second degree, with the burden on defendant to show to the satisfaction of the jury matters in mitigation or excuse.

**4. Homicide § 11—Right to kill in self-defense.**

The right to kill in self-defense rests upon necessity, real or apparent, and one may kill in self-defense when he reasonably believes that such action is necessary to save himself from death or great bodily harm, the reasonableness of his belief to be determined by the jury upon the facts and circumstances as they appeared to him at the time, but language alone, however abusive, is not sufficient, it being required that defendant be the subject of an actual or threatened assault.

**5. Same: Homicide § 7—**

If a person uses excessive force or unnecessary violence in defending himself, he is guilty of manslaughter at least.

**6. Homicide § 27h—Evidence held sufficient to be submitted to the jury on defendant's plea of self-defense.**

The State contended on its evidence that defendant was cut several times with a knife in an affray with his brother-in-law at a filling station, that defendant then went to a house some distance away, broke in and

secured a shotgun, returned, and shot his brother-in-law, killing him instantly. Defendant offered evidence tending to show that his brother-in-law was a much larger man than he, that after the affray he went to a house where he had stayed, that no one was there, and that he then went in and secured the gun, fearing that his brother-in-law would resume the fight and kill him, as he had threatened to do, that after getting the gun, he returned to the filling station, where he had his sleeping quarters, because he "had nowhere else to go," that as he was standing near the station his brother-in-law started out the door and down the steps from the kitchen, whereupon defendant told him if he continued to advance he would shoot, and that defendant fired the fatal shot as his brother-in-law continued to advance upon him. The court instructed the jury that the prior affray could not be considered on the plea of self-defense, and that defendant was guilty of murder in the second degree upon his own evidence. *Held:* Defendant's plea of self-defense should have been submitted to the jury on the evidence under appropriate instructions of the court.

APPEAL by defendant from *Grady, J.,* at May Term, 1937, of WARREN.

Criminal prosecution, tried upon indictment charging the defendant with the murder of one Andrew Knight.

The defendant pleaded not guilty and relied upon a plea of self-defense.

Verdict: Guilty of murder in the second degree.

Judgment: Twenty years at hard labor in State's Prison.

The defendant appeals to the Supreme Court, and assigns error.

*Attorney-General Seawell and Assistant Attorney-General McMullan for the State.*

*John Kerr, Jr., Julius Banzet, and W. H. Yarborough for defendant, appellant.*

WINBORNE, J. A careful consideration of the record on this appeal reveals substantial error, which entitles defendant to a new trial.

The evidence for the State tends to show that: At about 8:30 p.m., on 7 March, 1937, the defendant shot and killed Andrew Knight with a shotgun at a filling station known as "Friendly Inn," operated by Kennon "Bad Eye" Whitt, in Warren County, about a mile north of Norlina, and five miles from Warrenton. The defendant and Knight were brothers-in-law, defendant having married a sister of Knight. The defendant and his wife were estranged, she living in Henderson, Vance County, and he in one of two cabins at said filling station. Knight lived in Henderson. On the afternoon of 7 March, Knight, accompanied by Jeff (Chicken) Davis, went by automobile from Henderson to the Friendly Inn. When they arrived there the defendant was absent, but came in about an hour, around 4:30. Defendant and Knight drank whiskey together, then took an automobile ride to Henderson, came back

to the filling station and drank more whiskey. A fight ensued between them in which defendant was cut in three places, twice with a knife on his throat and on his arm, and once on his head with some blunt instrument. After some efforts had been made to get the defendant to go to a hospital, he went to the home of Ed Goodman, five miles away, broke into the house, secured a shotgun, and came back to the filling station, threatening and looking for Knight and shot him through the back door of the kitchen or shed room to the filling station, killing him instantly. The shot entered the left breast and ranged diagonally to the right. The wound was between the size of a quarter and of a half dollar. Powder burns were on the clothes.

On the other hand, defendant offered testimony tending to show that: Knight had no reason to come to the filling station. He and his family were not on friendly terms with defendant. When Knight learned that defendant was going to Henderson, he asked to go with him. On this trip, and after returning to the filling station, Knight talked about the estrangement of defendant and his wife, and at the filling station became so loud in his talk that the operator asked him to be quiet. Thereupon Knight and defendant went in the filling station. While in there Knight said: "Ted, I am going to tell you something, and if you cut up they will all know I told you, and if you cut up I will kill you." Later defendant asked Knight for a drink out of his bottle, and soon thereafter for another, and as defendant reached for the bottle Knight made a murderous assault on him, threw him to the floor, sat upon him, said: "I will kill him," and cut him with a penknife, once on the neck from behind the ear to the throat, and also on the arm, and again on the back of his head with something blunt, and desisted only when pulled off by those standing around, who begged him to quit cutting defendant and took the knife away from him. The cut on the neck and throat barely missed the jugular vein, and the cuts bled profusely. As defendant was walking and being helped to a car to go to a doctor, Knight struck him twice with his fist, then got in the car with defendant and made him drive. They went to Norlina, where defendant inquired of a Negro boy as to the doctor's residence. Knight said: "I don't think you are trying to find no doctor, but trying to get a warrant; if you don't carry me back to the service station I will finish cutting your damned head off." They went back to the station and Knight made defendant get out of the car. He then asked someone to take defendant to a hospital. Defendant replied: "Dick, I don't want to go to a hospital, I want to get a doctor to come here." Finally, Knight got "Chicken" Davis to drive the car and told him to carry defendant to a hospital "before he finished cutting the s. o. b." Defendant again protested going to the hospital. Davis drove the car and at defendant's direction stopped at the home of a

Negro named Alston, about one-tenth of a mile away, where defendant tried to borrow a shotgun, telling Alston he had "a little row down at the service station and was afraid they might come back." Failing to get a gun there, defendant directed Davis to drive to the home of Ed Goodman, where he formerly lived, and, finding no one at home, defendant went in and secured a gun and "for fear they might be arrested if they went to a hospital," drove back to the filling station because, as defendant said: "I had nowhere else to go." On arriving at the filling station, defendant asked as to the whereabouts of Knight, and, upon being told he had gone, defendant started to his cabin in which he lived. On the way he met Whitt and stopped to talk with him about getting a doctor. He was then in a very weakened condition from the loss of blood and his clothes were saturated with blood. He stepped aside for private purposes. While he was standing near, the back door to the kitchen, or shed to the filling station, "flew open" and Joe Brown, who was in the station, said to Knight: "Dick, don't go out there. Ted is out there with a shotgun," and Knight replied: "Damn the s. o. b., I am not scared of him." Whereupon, defendant said to Knight, who was coming out of the door and down the steps: "Dick, don't you come out here! Don't come out here! If you do I will shoot you." As Knight made the next step, about five and one-half yards away, defendant shot him. Defendant testified: "I shot him because he was advancing on me, had cut me with a knife, and threatened to kill me, and a man advancing on me like that." "I did not deliberately assassinate him because he cut me. I did not shoot him when he did not know I was there because I told him not to come out there. I did not know they had taken the knife away from him." Knight was about 29 years old, and weighed about 200 pounds, and was nearly 6 feet tall. The defendant was 34 years old, and weighed around 140 or 150 pounds.

At the close of all the evidence, and in the presence of the jury, the court, at the request of the solicitor for the State, stated: "I shall tell the jury if they believe the defendant's own evidence they will convict him of murder in the second degree, and whether he killed the deceased with premeditation and deliberation will be a matter for the jury to pass on, and of which I can have no opinion." Defendant excepted. Thereupon, the solicitor, through the court, announced that the State would not ask for a verdict of murder in the first degree.

Then counsel for defendant, after preserving exceptions, declined to argue the case. Exception is taken by defendant to several portions of the charge, the principal one of which is as follows: "And I charge you, gentlemen, positively, that what occurred in the early part of the night cannot be used here by him on his plea of self-defense; it has nothing to do with the case, and I charge you, gentlemen, that upon his own

evidence, that if the killing occurred as he himself swears it did, that he is guilty of murder in the second degree, and it would be your duty to return a verdict accordingly."

This instruction deprived the defendant of a substantial right to which he was entitled on his plea of self-defense.

Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation.

Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *S. v. Baldwin,* 152 N. C., 822, 68 S. E., 148.

The intentional killing of a human being with a deadly weapon implies malice and, if nothing else appears, constitutes murder in the second degree. When this implication is raised by an admission or proof of the fact of the killing, the burden is on the defendant to show to the satisfaction of the jury facts and circumstances sufficient to excuse the homicide or to reduce it to manslaughter. *S. v. Capps,* 134 N. C., 622, 46 S. E., 730; *S. v. Quick,* 150 N. C., 820, 64 S. E., 168; *S. v. Gregory,* 203 N. C., 528, 166 S. E., 387.

The plea of self-defense or excusable homicide rests upon necessity, real or apparent. In *S. v. Marshall,* 208 N. C., 127, 179 S. E., 427, the principle is clearly stated: "The decisions are to this effect:

"1. That one may kill in defense of himself . . . when necessary to prevent death or great bodily harm. *S. v. Gray,* 162 N. C., 608, 77 S. E., 833.

"2. That one may kill in defense of himself . . . when not actually necessary to prevent death or great bodily harm, if he believes it to be necessary and has a reasonable ground for the belief. *S. v. Barrett,* 132 N. C., 1007, 43 S. E., 832.

"3. That the reasonableness of this belief or apprehension must be judged by the facts and circumstances as they appeared to the party charged at the time of the killing. *S. v. Blackwell,* 162 N. C., 683, 78 S. E., 316.

"4. That the jury and not the party charged is to determine the reasonableness of the belief or apprehension upon which he acted. *S. v. Nash,* 88 N. C., 618."

In *S. v. Barrett, supra,* it is stated: "The defendant's conduct must be judged by the facts and circumstances as they appeared to him at the time he committed the act, and it should be ascertained by the jury, under evidence and proper instructions of the court, whether he had a reasonable apprehension that he was about to lose his life or to receive enormous bodily harm. The reasonableness of his apprehension must always be for the jury, and not the defendant, to pass upon, but the jury must form its conclusion from the facts and circumstances as they

appeared to the defendant at the time he committed the alleged criminal act. If his adversary does anything which is calculated to excite in his mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assault him and to take his life or to inflict great bodily harm, it would seem that the law should permit him to act in obedience to the natural impulse of self-preservation and to defend himself against what he supposes to be a threatened attack, even though it turns out afterwards that he was mistaken; provided, always, the jury finds that his apprehension was a reasonable one, and that he acted with ordinary firmness."

In *S. v. Blevins,* 138 N. C., 668, 50 S. E., 763, it is said: "It has been established in this State by several well considered decisions that where a man is without fault, and a murderous assault is made upon him, an assault with intent to kill, he is not required to retreat, but may stand his ground, and if he kills his assailant and it is necessary to do so to save his life or protect his person from great bodily harm, it is excusable homicide, and will be so held, the necessity, real or apparent, to be determined by the jury on the facts as they reasonably appeared to them." *S. v. Thornton,* 211 N. C., 413.

In *S. v. Cox,* 153 N. C., 638, 69 S. E., 419, it was said: "In order to make good the plea of self-defense, the force used must be exerted in good faith to prevent the threatened injury, and must not be excessive or disproportionate to the force it is intended to repel, but the question of excessive force was to be determined by the jury." *S. v. Robinson,* 188 N. C., 785, 125 S. E., 617.

If excessive force or unnecessary violence is used, the defendant would be guilty of manslaughter at least. *S. v. Glenn,* 198 N. C., 80, 150 S. E., 663; *S. v. Cox, supra.*

"The legal provocation which will reduce murder in the second degree must be more than words; as language, however abusive, neither excuses nor mitigates the killing, and the law does not recognize circumstances as a legal provocation which in themselves do not amount to an actual or threatened assault." *S. v. Benson,* 183 N. C., 795, 111 S. E., 869.

In *S. v. Hough,* 138 N. C., 663, 50 S. E., 709, the Court said: "It is contended by the State that the fact that the defendant procured a pistol on the morning of the homicide is to be taken as conclusive evidence on the part of the defendant to unlawfully use the pistol if an emergency arose, and that he was in fault in entering into a combat with a deadly weapon. This would probably be a legitimate argument but for the fact that the testimony disclosed that the deceased threatened to kill the defendant; that he told the defendant's wife to tell him so, and in view of the fact that there was a great disparity in the size and strength of the two men, it does not follow necessarily that the defendant's purpose was to do more than defend himself."

LEONARD v. INSURANCE CO.

Applying these principles, there is sufficient evidence to be submitted to the jury on defendant's plea of self-defense. The questions as to whether the defendant, under the facts and circumstances as they existed and appeared to him at the time of the killing, acted in good faith and with reasonable firmness, had reasonable ground to believe, and did believe, that the deceased intended to take his life or to do him great bodily harm, and as to whether the defendant used no more force than was necessary, were for the consideration of and determination by the jury, under appropriate instructions of the court.

The failure of the court to submit the questions of justification and mitigation to the jury under appropriate instructions is error for which the defendant is entitled to a new trial, and it is so ordered.

New trial.