## STATE v. GORRELL SHEEK.

(Filed 14 June, 1941.)

**1. Homicide §§ 16, 27b—Upon proof of killing with deadly weapon burden is on defendant to prove matters in justification or mitigation.**

In this prosecution for homicide defendant did not plead justification or excuse, but contended that the State's evidence disclosed that he inflicted the fatal wounds in a fight with the deceased under circumstances reducing the crime to manslaughter. *Held:* A charge to the effect that upon proof of an intentional killing with a deadly weapon the law presumes that the killing was unlawful and that there was malice, placing the burden upon defendant of showing to the satisfaction of the jury matters in justification, must be held for error for omitting from the charge that defendant was entitled to show matters in mitigation.

**2. Homicide § 6—**

Defendant's contention that the State's evidence was susceptible of only the one inference that the killing was the result of passion produced by a fight, and that therefore the court, as a matter of law, should have limited the jury to a verdict no greater than manslaughter *is held* untenable, the question of malice being for the determination of the jury upon the evidence in the case and the presumption arising from proof of an intentional killing with a deadly weapon.

APPEAL by defendant from *Rousseau, J.,* at January Term, 1941, of FORSYTH.

Criminal prosecution upon indictment charging defendant with the murder of one Frank Moses.

Defendant pleaded not guilty.

Upon the trial the State offered expert medical testimony tending to show that Frank Moses, when examined at the hospital at 9 o'clock on Saturday night, 21 December, 1940, had two wounds—one a gash six inches long involving the skin and muscle under his left arm, and the other about three inches long near the belt line in the abdomen, and that, though neither his pleural nor abdominal cavities were penetrated, he died three hours later from loss of blood from these wounds.

The following narrative, based in the main upon testimony of Myrtle Smith, witness for the State, tends to show the facts leading up to the infliction of these wounds, as the State contends, by the defendant.

On 21 December, 1940, around 11 o'clock a.m., defendant Gorrell Sheek, called Jack, went to the room of Myrtle Smith, where she resided, at the Biltmore Hotel in High Point, North Carolina. Later the same day, about 2 o'clock p.m., Frank Moses, the deceased, called Myrtle Smith to lobby of hotel and asked "where Jack was." Then they joined him in her room. After talking awhile Moses suggested a ride and

something to drink. They rode in defendant's automobile out from High Point, and, after Moses had obtained "a pint of liquor," they stopped at another place, played the piccolo, drank and danced. Then another pint was procured. After half of it was consumed, the three came back through High Point and went "straight to Winston-Salem," arriving there around 6 o'clock. Sheek went to Irene Ward's house and in a few minutes came out with and introduced her to Myrtle Smith and deceased. Myrtle Smith "had a date with Sheek that day. Moses was dating Irene." The four, Sheek and Myrtle Smith on the front seat, rode to Friendly Tavern. It was dark then. There the piccolo was played, the rest of the second pint was consumed by them, and they danced. Defendant and Irene Ward then went for and returned with "a pint of liquor." This was opened and "just one drink" was taken. "There had been no words or anything before" they left Friendly Tavern, where they had been for two or three hours. Leaving there Myrtle Smith started to get in the front seat and defendant asked her "to get in the back with Frank," and she did. Irene Ward sat on the front seat with defendant, who "drove the car straight." They came back to town and went to Irene Ward's house. She and defendant went into the house, as they said, to get a drink. Though invited to go in also, the deceased and Myrtle Smith stayed in the car. When defendant and Irene Ward returned in about ten minutes, deceased said to Sheek, "Let's go to High Point." Defendant drove from there to Hattie Avenue. He and deceased were fussing. Deceased was trying to get defendant to carry him and Myrtle Smith back to High Point. Defendant wanted to go to a beer garden. Deceased told him to stop the car, but he would not. Deceased picked up a bottle in the car and started to hit defendant over the head with it, but Myrtle Smith "grabbed him." Deceased threw the bottle on the floor, and defendant stopped the car. Myrtle Smith first got out, she was followed by Irene Ward, who began fussing and calling her names and trying to make her get back in the car. Myrtle Smith "smacked her." Deceased then got out of the car. Myrtle Smith put Irene Ward back in the car and "told her and Jack to go on wherever they wanted to." They did not drive off. Deceased told defendant that he and Myrtle Smith were going to get a way back to High Point if they had to get a cab to go in, and, in the language of Myrtle Smith, "for him to go on and leave us alone." Then she and deceased walked across to the sidewalk and started up the street. Defendant turned the car around and "hollered and asked" deceased for a cigarette. Myrtle Smith told deceased "not to give him a cigarette, not to go back to the car, there might be trouble." Defendant again asked for a cigarette. Deceased still refused. Defendant jumped out of the car and started toward deceased and Myrtle Smith—taking his knife out of his pocket and

starting to open it. Deceased told him not to come on him, and threw a bottle at him. Defendant said to deceased, "I will kill you, G—— d——— you." Deceased ran across the street, 30 or 40 feet, and fell down at the curb on the other side. The defendant ran after him. He had his knife open when he passed Myrtle Smith. She testified that she ran into a field, that she saw defendant bend over deceased "with his hand up," but that "she could not tell exactly what Sheek had in his hand." She further said: "When I got in the field I heard someone coming toward me hollering 'Oh.' I looked back and it was Frank. I went to him and asked him if he was hurt, and he said 'Yes, I am cut all to pieces.' . . . : I would say it was four or five minutes from the time I saw defendant stoop over Frank until Frank overtook me."

Irene Ward testified for the State that she did not know anything about deceased being cut until next day. There was also evidence from an officer that he arrested defendant that night and took a knife off of him, and that the knife had blood on it, though no blood was found on the clothes of the defendant. The officer also testified that defendant appeared to be drinking, but was not so drunk that he would have arrested him for it.

Defendant offered no evidence.

Verdict: Guilty of murder in the second degree.

Judgment: Confinement in the State Prison, at Raleigh, North Carolina, for a period of not less than fifteen nor more than twenty-two years, and assigned to work under the control and supervision of the State Highway & Public Works Commission.

Defendant appeals therefrom to Supreme Court, and assigns error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton and Patton for the State.*

*John D. Slawter and Richmond Rucker for defendant, appellant.*

WINBORNE, J. While defendant stresses for error many assignments, we are of opinion that exceptions three and four to portions of the charge of the court below are, in the respects here indicated, well taken.

The charge to which exception three relates is as follows: "Now, gentlemen, there is another principle of law applicable in second degree murder and that is this: (Where it has been proven by the State or admitted by the defendant that one killed another and killed him with a deadly weapon, that raises two presumptions. That raises a presumption that the killing was unlawful and that there was malice, and then the . burden rests upon the defendant, gentlemen, not to satisfy you gentlemen beyond a reasonable doubt, or by the greater weight of the evidence or by a preponderance of the evidence, but simply satisfy you gentlemen that the killing was justified on his part.)"

Then after stating contention of the State that deceased died as result of knife wounds, and after defining a deadly weapon, the court further charged: "So the State argues you ought not to have any doubt that there was a killing; that this defendant did it; that he inflicted the wounds that brought about death a few hours later of the deceased; that this was a deadly weapon and then, nothing else appearing, the defendant would be guilty of murder in the second degree, as the burden then rests upon him to satisfy you gentlemen that he was justified in what he did do." Exception 4.

When the intentional killing of a human being with a deadly weapon is admitted, or is established by the evidence, the burden is upon the defendant to show to the satisfaction of the jury facts and circumstances sufficient to justify or excuse the homicide, or to reduce it to manslaughter. *S. v. Quick,* 150 N. C., 820, 64 S. E., 168; *S. v. Atwood,* 176 N. C., 704, 97 S. E., 12; *S. v. Gregory,* 203 N. C., 528, 166 S. E., 387; *S. v. Terrell,* 212 N. C., 145, 193 S. E., 161; *S. v. Robinson,* 213 N. C., 273, 195 S. E., 830; *S. v. Bright,* 215 N. C., 537, 2 S. E. (2d), 541, and numerous other cases.

The vice in the charge given is that, in order to escape the presumption arising from an intentional killing with a deadly weapon, the burden is on defendant to justify his acts. While doubtless a slip of the tongue, this denies to him the opportunity, to which he is entitled, to show facts and circumstances in mitigation sufficient to reduce the crime to manslaughter. The defendant does not plead justification or excuse. He pleads not guilty, and contends that, in any event, the evidence for the State shows facts and circumstances in mitigation sufficient to reduce the crime to manslaughter.

Defendant further contends, with respect to these and other portions of the charge to which exceptions are also taken, that all the evidence, considered in the light most favorable to the State, is susceptible of only one inference, that is, that the killing was the result of passion produced by a fight, and that under the principle stated in *S. v. Quick, supra; S. v. Baldwin,* 152 N. C., 822, 68 S. E., 148; and *S. v. Gregory, supra,* the court as a matter of law should have limited the jury to a verdict no greater than manslaughter. We are of opinion, however, that the evidence is not so clear as to admit of decision as a matter of law.

We refrain from discussing other exceptions to matters which may not recur on another trial.

For errors pointed out, let there be a

New trial.