## STATE v. GENEAL WASHINGTON.

(Filed 21 November, 1951.)

**1. Criminal Law § 53d—**

G.S. 1-180 requires the presiding judge to declare and explain the law as it relates to the different aspects of the evidence on each side of the case, so as to bring into focus the relations between the different phases of the evidence and the applicable principles of law.

**2. Homicide § 27f—Evidence held to require charge on defendant's right of self-defense where murderous assault is made upon her.**

Where all the evidence tends to show that defendant was not the aggressor and defendant's evidence is to the effect that after assaulting her first with his fists and then with a large stick, her assailant announced his intention to take her out of sight of bystanders and kill her, and was in the act of attempting to drag her away when she stabbed him in a fatal

spot with a knife because she "knowed what would happen" or that he
would carry out his threat, *held* to require an instruction on the right of
a person subjected to a murderous assault to stand his ground and kill if
necessary in self-defense, and an instruction to the effect that a person
who brings on the difficulty must quit the fight and retreat to the wall in
order to claim self-defense is erroneous as partially inapplicable, incom-
plete and misleading.

APPEAL by defendant from *Clement, J.,* and a jury, at 13 August,
1951, Extra Criminal Term, of MECKLENBURG.

Criminal prosecution tried upon a bill of indictment charging the
defendant with the murder of her husband, Booker T. Washington.

When the case was called for trial, the solicitor announced he would
not prosecute the defendant for murder in the first degree, but would ask
for a verdict of murder in the second degree or manslaughter as the
evidence might disclose. *S. v. Wall,* 205 N.C. 659, 172 S.E. 216.

The evidence of the State reveals that on the morning of 28 July, 1951,
two police officers of the City of Charlotte found the deceased in the
street in a dying condition with stab wounds about his body. He was
taken immediately to the hospital, but a few minutes after arrival died
"from massive hemorrhage into the chest cavity as a result of a knife
wound." Other wounds on his body were not of fatal character.

Officer McCoy testified that after sending the deceased to the hospital
he went to the home of the defendant, about half a block away. She was
changing her clothes. She admitted killing her husband with a deadly
weapon, but claimed self-defense. She said she stabbed him "with a
dagger-type knife about seven or eight inches long, . . . that they had
had a fight over a small amount of money just prior to the stabbing . . .
said they had got in the street and that he was beating her with his fists,
that he had knocked her down an embankment about eight feet and was
beating her with a board and with his fists. And she said they came back
up onto the sidewalk and he was fighting her and she stabbed him in the
chest with the knife. She said they fought all the way up the bank."
Officer McCoy further testified that he saw "some boards—little slats
. . . lying at the bottom of the hole (embankment) . . . They were
. . . about two feet long and about the width of your four fingers." He
said he saw no injuries on the defendant, but saw blood on her dress.

The defendant testified that she and the deceased had been married
five years; that they had three children, ages three years, two years, and
eight months, and that she was five months pregnant with his fourth
child; that he had the reputation of being a violent and dangerous man;
that he had committed assaults on her throughout their married life.
She said he had inflicted extensive knife wounds on her on several occa-
sions and that they separated 14 March, 1951, after he assaulted her with

a shovel and drove her from home, and that they had lived separate and apart since that time; that on Friday evening, 27 July, 1951, at about 10:00 o'clock (the night before the homicide), she met deceased at a grocery store where he bought some groceries for her and the babies and gave her for the family $20.00 out of $43.00 he then had; that at his request she met him about an hour later on the street. He was drinking and cursing, so she went home. Soon thereafter he came to her home (where she was staying with her mother). They talked a while and he left, but came back a few hours later and demanded a return of some of the $20.00 he had given her earlier that night. She did not go out of the house. He stayed around, cursing and abusing her from outside. And in an altercation with defendant's sister he was cut in the face with a knife. Police officers took him to a hospital where he was sewed up. On the way to the hospital he told the officers he was going to kill his wife "if it took 500 years to serve for it." Officer Spencer said he was sober, but appeared to be angry. After being released by the officers, the deceased again went back to the defendant's home,—about 5:00 o'clock in the early morning. This time he gained entrance to the house, assaulted her and tried to drag her outside, but failed and left. Then, about 9:30 a.m. he reappeared and asked for 65c for breakfast. As she handed it to him at the front door, he pulled her out by the wrist, dragged her off the porch, down the street, knocked her over an embankment, jumped down on top of her and beat her with his fists; that then for the first time she "just nicked him with her nephew's Boy Scout knife," which she had picked up in the house when she took the 65c to the door to give her husband. She said she did not try to inflict serious injury, but was merely trying to cause him to stop beating her; that he then picked up a large stick and struck her several times with it, after which he dragged her up the embankment while continuing to beat her; that he told her "I'm going to take you where nobody will get me (a number of persons were standing around) because I'm going to kill you"; that he kept beating her and dragged her away and she stabbed him in the chest to get loose because, as she put it, "he told me what he was going to do to me and I knowed what would happen." After stabbing him she turned and went home and he ran down the street and fell.

The defendant's narrative of the assault was corroborated in the main by the testimony of several eyewitnesses.

Verdict: Guilty of manslaughter.

Judgment: Imprisonment in the Woman's Division of the State Prison at Raleigh for a term of four years.

The defendant appealed, assigning errors.

*Attorney-General McMullan and Assistant Attorney-General Love for the State.*

*Richard M. Welling for defendant, appellant.*

JOHNSON, J. All the evidence offered at the trial below shows that the deceased, and not the defendant, was the aggressor. The defendant's evidence indicates that she was entirely free from fault and never fought willingly and unlawfully. Her evidence further shows that the deceased made a violent attack upon her. First he assaulted her with his fists, knocking her down an embankment; and then struck her several blows with a large stick. Following this, while attempting to drag her away from the people who were standing by, he declared it was his purpose to take her out of sight and kill her. She begged the deceased to stop beating her, and it was only after he announced his intention to take her elsewhere and kill her that she stabbed him in a vital spot.

It thus appears that the defendant's evidence, if believed, showed she was defending against a murderous, as distinguished from an ordinary nonfelonious, assault.

The defendant contends, and our examination of the record discloses, that the trial court failed to instruct the jury as to the law applicable to this phase of the defendant's evidence in compliance with the mandatory requirements of G.S. 1-180, as rewritten by Chapter 107, Session Laws of 1949. This statute requires the presiding judge to declare and explain the law as it relates to the different aspects of the evidence on each side of the case, so as to bring into focus the relations between the different phases of the evidence and the applicable principles of law. *S. v. Fain*, 229 N.C. 644, 50 S.E. 2d 904; *Lewis v. Watson*, 229 N.C. 20, 47 S.E. 2d 484; *S. v. Bryant*, 213 N.C. 752, 197 S.E. 530.

In *S. v. Hough*, 138 N.C. 663, p. 667, 50 S.E. 709, *Brown, J.*, said:

"There is a distinction made by the text-writers on criminal law, which seems to be reasonable and supported by authority, between assaults with felonious intent and assaults without felonious intent. 'In the latter, the person assaulted may not stand his ground and kill his adversary if there is any way of escape open to him, though he is allowed to repel force with force and give blow for blow. In the former class, where the attack is made with murderous intent, the person attacked is under no obligation to fly, but may stand his ground and kill his adversary if need be.' 2 Bishop's Criminal Law, sec. 6333, and cases cited. It is said in 1 East, Pleas of the Crown, 271: 'A man may repel force by force in defense of his person, habitation or property against one who manifestly intends or endeavors by violence to commit a felony, such as murder, rape, burglary, robbery and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he

has secured himself from all danger, and if he kill him in so doing it is, called justifiable self-defense.' The American doctrine is to the same effect. See *S. v. Dixon,* 75 N.C. 275."

In *S. v. Blevins,* 138 N.C. 668, p. 670, 50 S.E. 763, with *Hoke, J.,* speaking for the Court, it is stated: ". . . that where a man is without fault, and a murderous assault is made upon him—an assault with intent to kill—he is not required to retreat but may stand his ground, and if he kill his assailant and it is necessary to do so in order to save his own life or protect his person from great bodily harm, it is excusable homicide and will be so held; . . . this necessity, real or apparent, to be determined by the jury on the facts as they reasonably appeared to him." See also *S. v. Thornton,* 211 N.C. 413, 190 S.E. 758; *S. v. Bost,* 192 N.C. 1, 133 S.E. 176; *S. v. Dixon,* 75 N.C. 275; *S. v. Harris,* 46 N.C. 190.

The failure of the trial court to instruct the jury in accordance with this settled principle of law, under which are fixed the rights of a person upon whom a murderous assault is made, undoubtedly weighed heavily against the defendant. That this is so seems all the more likely in view of the following instruction given the jury by the trial court, to which the defendant excepted:

"Now, gentlemen, where a person brings on a difficulty and is responsible for the fight, if his assailant presses him harder than he anticipated, then before such person could claim that he or she was fighting in self-defense, the law provides that the person must quit the fight, retreat to the wall, quit the combat, and go away, if he can do so in safety, before he or she can claim self-defense. If their back is already to the wall, even though they bring on the difficulty, if they cannot retreat without subjecting themselves to the hazard and danger of great bodily harm or death, then they can still stand their ground and deliver blow for blow and may claim self-defense."

This instruction is correct as a general statement of one phase of the law of self-defense. However, since the record here discloses no evidence tending to show that the defendant brought on the difficulty or was the aggressor, it necessarily follows that the instruction as it relates to the evidence in this case was partially inapplicable, incomplete and misleading. *S. v. Lee,* 193 N.C. 321, 136 S.E. 877; *S. v. Waldroop,* 193 N.C. 12, 135 S.E. 165.

For the reasons given, it would seem that the defendant is entitled to another trial, and it is so ordered. This being so, it is not necessary to review the remaining assignments of error.

New trial.