CLARK, C. J., dissenting.
The defendant was indicted for the murder of Roby Carter on 21 July, 1913, and from the judgment rendered on a verdict of manslaughter, he appealed. He was sentenced to four years in the State's Prison.
(393) The deceased was living on a place owned by one Charles Voncanon, about 1 1/2 or 2 miles from Voncanon's residence. The defendant is a boy of about 17 years of age, whose home is in Georgia, and who had been living with the Voncanons since about 20 April. On the night of the homicide the deceased went to the Voncanon pasture and took out a horse and rode off with it. Mr. Voncanon was away and Mrs. Voncanon was awakened by the slamming of the gate and the noise of the horse's hoofs. She got up, recognized the horse, but not the man, and awakened the defendant and told him to go out and see about it. The defendant went to the barn and pasture, discovered that the horse and bridle had been taken, and went over to the house of one Bynum Banner to see if he could learn anything about it. Banner had heard the horse going down the road about thirty minutes before, and while the defendant was there they heard a horse coming up the road. The *Page 349 
defendant went out, and the witness for the State, Bynum Banner, gives the following account of the shooting: "When I heard the horse the second time, defendant left my room. I heard defendant say, `Halt there! Throw up your hands!' three times; then gun fired; 22 rifle. Carter said, `Quit that.' Defendant said, `Halt and throw up your hands!' Defendant shot second time. Carter said, `Quit that! Quit that!' Then gun fired third time, and Carter said, `Oh, Lordy! You have killed me.' I went out; they were walking toward each other. Roby said, `Why did you shoot me?' Defendant said, `I am sorry that I shot you; but you ought to have told me who you were; you ought to have stopped when I called to you.'" Bynum Banner further testified, on being recalled, that the defendant said to him that he thought some one had ridden the horse to get liquor.
There was evidence tending to show that Voncanon had told the deceased that he might borrow a horse at any time, and when the deceased borrowed the horse on the night he was killed, he did so to get medicine from a doctor for his sick child.
The defendant testified in his own behalf, and the material part is as follows: "I have been living in this country since 20 April, with Mrs. Voncanon. Am 17 years old. Night of 21 July I had been out late to rehearse; went to bed; been there half-hour. Aunt Nollie woke me up; told me she heard gate slam; heard trot of horse; (394) thought it was a certain horse of hers; I got up, went to barn; took rifle with me; searched the pasture; found one of the horses missing; found one of the bridles missing. I went back and told her. She wanted me to go to Bynum Banner's and see if I could get any information. I went and woke him up. Asked him where his horse was. Told him our horse was gone and one of the bridles missing. We talked a few minutes; heard the horse coming. I walked out in the moonlight to the fence. I looked to see if I could recognize the man with the horse. Could not. I told him to halt and throw up his hands. I had no reason to shoot, but he kept riding, and I shot. Did not shoot to hit him. He said, `Quit that!' I hollered to him to halt and throw up his hands again. He was getting a little by me. He twisted around and had a bottle; I thought it was a nickel-plated pistol. I shot again and he either fell off or jumped off. He said, `Don't shoot again; it is Roby.' I did not shoot to hit him at first, but just thought he would stop. Before he wore mustache; that night he was clean shaven. I asked him why he did not tell me sooner who he was. He said he just pulled on and thought I was `kidding' him. The horse belonged to Mr. and Mrs. Voncanon. He passed from the barn by the house going to the doctor's. Forks of roads where I shot him, but I could not tell if he intended to *Page 350 
turn off at the forks or not. We were entirely friendly. I had given him a shirt the day before. Aunt Nollie told me that the horse had been taken without her permission." He further testified, on cross-examination: "I had known Roby Carter from April to 21 July. He worked there, but did not handle the horses. He worked a crop, but I plowed the ground for him. The moon was shining, giving light to a certain extent. I was 50 or 60 feet from Roby when I first saw him. Could not identify the horse when I first saw him. Could not tell its color, but judged it by its size and sound. I did not care about the man, but wanted the horse. Can't tell why I fired the first two shots; had no reason; fired it with the expectation of him stopping. Had the butt of gun on fence and fired straight up — the horse was trotting all (395) the time. I did not shoot to hit him until he flourished the bottle, and I thought it was a nickel-plated pistol."
Mrs. Nollie Voncanon testified in behalf of defendant: "Was at home that night with my two little girls and Bailey. My husband was at Elk Park. I was awakened by slamming of gate and heard horse's hoofs. I got up and recognized the horse, but not the man. I waked Bailey; told him to go to the barn and see if the horse was gone. He did so and took this little rifle. I sent him to Bynum Banner's. No one asked me about the horse. When I got to where Bailey and Roby were, Bailey said, `Roby, why did you not speak?' and Roby said, `I was to blame; I ought to have spoken.' On Friday Roby had a mustache and growth of beard on his face. This day his hair was clipped and he clean shaven, `ghostly looking.' Horse has long, slinging trot, different from any other horse we ever owned. I told Bailey that some one had stolen Curly, as I thought, but for him to go to the barn and see."
His Honor charged the jury, in effect, that if they believed the evidence, the defendant was guilty of manslaughter, at least, and the defendant excepted.
The charge of his Honor deprived the defendant of the benefit of his plea of self-defense, and if there is any evidence to support the plea, the charge is erroneous.
This Court said in S. v. Gray, 162 N.C. 612, that, "One may kill when necessary in defense of himself, his family, or his home, and he has the same right when not actually necessary, if he believes it to be so, and he has a reasonable ground for the belief," and in S. v. Kimbrell, *Page 351 151 N.C. 709, "If there was any evidence to go to the jury in support of this contention, then it was for the jury, and not for the court, to pass upon the question of his motive in firing the shots, as well as thereasonableness of the grounds of his apprehension. S. v. Nash,88 N.C. 618; S. v. Harris, 119 N.C. 861; S. v. Hough, 138 (396) N.C. 663; S. v. Blevins, 138 N.C. 668; S. v. Castle,133 N.C. 769; S. v. Clark, 134 N.C. 699; S. v. Barrett, 132 N.C. 1005."
It was also said in S. v. Barrett, 132 N.C. 1007: "In some of the early cases expressions may be found which would seem to indicate that a case of self-defense is not made out unless the defendant can satisfy the jury that he killed the deceased from necessity; but we think the most humane doctrine and the one which commends itself to us as being more in accordance with the enlightened principles of the law is to be found in the more recent decisions of this Court. It is better to hold, as we believe, that the defendant's conduct must be judged by the facts and circumstances as they appeared to him at the time he committed the act, and it should be ascertained by the jury, under the evidence and proper instructions of the court, whether he had a reasonable apprehension that he was about to lose his life or to receive enormous bodily harm. The reasonableness of his apprehension must always be for the jury, and not the defendant, to pass upon, but the jury must form their conclusion from the facts and circumstances as they appeared to the defendant at the time he committed the alleged criminal act. If his adversary does anything which is calculated to excite in his mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assail him and to take his life or to inflict great bodily harm, it would seem that the law should permit him to act in obedience to the natural impulse of self-preservation and to defend himself against what he supposes to be a threatened attack, even though it may turn out afterwards that he was mistaken; provided, always, as we have said, the jury find that his apprehension was a reasonable one and that he acted with ordinary firmness," and this was approved in S. v. Blackwell, 162 N.C. 683.
These authorities (and many others to the same effect could be cited) establish the following propositions:
(1) That one may kill in his defense when necessary to prevent death or great bodily harm.
(2) That he may kill, when not necessary, if he believes it to be so and has a reasonable ground for the belief.
(3) That the reasonableness of the belief must be judged by (397) the facts and circumstances as they appeared to the partycharged at the time of the killing. *Page 352 
(4) That the jury, and not the party charged, are to determine the reasonableness of the belief.
(5) That if there is any evidence that the party charged has killed under a reasonable belief that he is about to suffer death or great bodily harm, and to prevent it, the plea of self-defense must be submitted to the jury.
Applying these principles, we cannot say, as matter of law, there is no evidence of self-defense.
There is evidence tending to prove that the defendant was living at the home of Mrs. Voncanon; that on the night of the killing he was the only male present at the home; that he was awakened by Mrs. Voncanon late at night and told that her horse had been stolen; that he went to the pasture and found a horse and bridle missing; that he went to a neighbor's in search of the horse, carrying a rifle with him; that while there he heard the horse approaching and went to the road; that he recognized the horse; that he had known the deceased before, but did not know who he was at the time of the killing, because he had shaved off his mustache; that it was a moonlight night; that he told the deceased twice to stop, and he did not do so; that he fired the rifle twice and the deceased told him to quit; that he did not shoot at the deceased, but each time he shot, the butt of his rifle was resting on the fence, and he fired straight up; that after he shot the second time, the deceased twisted around and flourished something which the defendant thought was a pistol; that the defendant then fired the fatal shot and because he believed the deceased was going to shoot him.
If these facts are accepted by the jury, and they find that the last shot was fired under a reasonable apprehension of death or great bodily harm, the defendant would be entitled to an acquittal.
The deceased had a bottle of medicine and not a pistol, and he had not stolen the horse; but the conduct of the defendant must not be judged by the facts as they actually existed, but as they reasonably appeared to him.
(398) If his evidence is believed, he thought he was in pursuit of a horse thief, and it was the part of prudence to take his rifle with him. When he met the supposed thief, he had the right to tell him to stop, and he was not in the wrong to shoot the rifle in the air, and not at the deceased, as notice that he was armed, and an inducement to obey the command to halt. If so, he was guilty of no wrongful act up to the firing of the last shot, and there is evidence that this shot was fired in self-defense.
There is evidence on the part of the State tending to prove that the defendant knew the deceased; that the killing was in a short distance *Page 353 
of the place where the horse was taken; that as the deceased was going in that direction, the defendant must have known he was returning the horse, and other facts indicating that there was no necessity for the killing; but these are for the jury.
For the error pointed out, there must be a
New trial.