STATE OF NORTH CAROLINA v. SHADEEK ALI PITTMAN

No. COA09-1190

(Filed 21 September 2010)

**Criminal Law— self-defense—instruction—prior threats insufficient**

The trial court did not err in a first-degree murder case by denying defendant's request for an instruction on self-defense. Although the record established that the victim had threatened defendant repeatedly, the record was devoid of any evidence that the victim ever attempted to actually harm defendant. Prior threats, without more, were not sufficient to establish the existence of a reasonable need to use deadly force.

Appeal by defendant from judgment entered 29 January 2009 by Judge W. Russell Duke, Jr., in Pitt County Superior Court. Heard in the Court of Appeals 9 March 2010.

*Attorney General Roy Cooper, by Buren R. Shields, III, Special Deputy Attorney General, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant.*

ERVIN, Judge.

Defendant Shadeek Pittman appeals from judgment entered by the trial court sentencing him to life imprisonment without parole in the custody of the North Carolina Department of Correction based on a jury verdict finding Defendant guilty of first-degree murder. After careful consideration of Defendant's challenge to the trial court's judgment in light of the record and the applicable law, we find that Defendant received a fair trial, free from prejudicial error, and that the trial court's judgment should remain undisturbed.

STATE v. PITTMAN

[207 N.C. App. 205 (2010)]

## I. Factual Background

### A. State's Evidence

On 17 July 2007, Larry McLean, who had known Defendant for two or three years, rode his bicycle to a convenience store in Greenville, North Carolina. Mr. McLean had a number of criminal convictions and admitted having used marijuana. At the convenience store, Mr. McLean saw Defendant, who was also riding a bike. While Defendant and Mr. McLean talked in the parking lot, Kenneth DeWayne Andrews arrived and entered the store. When Mr. Andrews exited the store, he asked Defendant if he wanted to fight and said, "You still want to do that . . . we can go on the side or we can go ahead and do it now." Mr. Andrews accused Defendant of having stolen his wallet and pants, leading Defendant to point out that he had returned Mr. Andrews' pants. During the time they were at the convenience store, Defendant told Mr. McLean that Mr. Andrews had threatened Jessica Benson, the mother of Defendant's son, while they were at a park, a statement that Mr. Andrews did not dispute.

Although Mr. McLean urged Defendant and Mr. Andrews to end their feud, Defendant and Mr. Andrews continued to argue. Mr. McLean did not, however, see either Defendant or Mr. Andrews make a threatening gesture or display a weapon. However, Defendant did have a gun in his pocket on that occasion. According to Mr. McLean, Mr. Andrews was "fussing with [Defendant] about the pants and his wallet." When Defendant referred to a video he had made of Mr. Andrews' daughter, Mr. Andrews complained that the video "didn't come out right." Mr. McLean testified that Defendant and Mr. Andrews "kept going back and forth about the film, the wallet, [and the] pants." Finally, Mr. Andrews stated to Defendant that:

> [W]hen you see me at [the] K&A [convenience store] you need to go to Kings [convenience store]. And if I'm at Kings you need to go to K&A, and if I'm walking down the street you need to cross over.

After Mr. Andrews made this pronouncement, Defendant rode off on his bike while Mr. McLean remained at the store talking to Mr. Andrews about ending his conflict with Defendant, until he "got [Andrews] calmed down[.]"At that point, Mr. Andrews walked towards his house and Mr. McLean rode away on his bicycle.

A few minutes later, Mr. McLean saw Defendant riding his bicycle. Shortly thereafter, Mr. McLean saw Mr. Andrews in front of his house. Mr. Andrews called Mr. McLean over and told Mr. McLean that

he realized that it was time to end his conflict with Defendant. For that reason, Mr. Andrews asked Mr. McLean to tell Defendant that he was ready to stop quarreling about the stolen pants and wallet. During this conversation, Mr. Andrews was standing in his front yard while Mr. McLean straddled his bicycle in the street.

At that point, Defendant rode up on his bicycle and asked if Mr. Andrews and Mr. McLean were "still talking mess." At the time that he came to Mr. McLean's location, Defendant, who did not normally wear such an item of clothing, had a glove on his hand. According to Mr. McLean, Mr. Andrews attempted to tell Defendant "to let it go." However, Defendant "pulled out a gun." Although Mr. Andrews was "trying to talk," Mr. McLean testified that Defendant would not "listen to what we had to say, and when he pulled the gun out, he fired it." After Mr. McLean heard a shot, he saw Mr. Andrews grab his neck. Mr. McLean testified that Mr. Andrews did not approach Defendant, reach behind his back, or curse at Defendant before Defendant shot him. Instead, Mr. McLean stated that "we [were] trying to get [Defendant] not to do nothing he didn't have no business because we seen him with the gun." Mr. McLean left immediately, but he heard three more shots as he rode away. Later that day, Defendant called Mr. McLean, but hung up when Mr. McLean asked him, "Why did you do that?"

Elbert Biggs lived across the street from Mr. Andrews. On 17 July 2007, Mr. Biggs saw Defendant ride up on his bicycle and shoot Mr. Andrews while Mr. Biggs was on his own front porch. Mr. Biggs stated that, at the time that he initially appeared, Defendant was wearing gloves with cut-off fingers on his right hand and was holding a pistol on his handlebars with his finger on the trigger. After the first shot was fired, Mr. Andrews' neck went around; after the second shot was fired, Mr. Andrews leaned over; at the time of the third shot, Mr. Andrews was running into his house. According to Mr. Biggs, Mr. Andrews was unarmed. Mr. Biggs admitted that he had glaucoma and cataracts, that his vision was blurred when he did not wear glasses, and that he was not wearing glasses that day.

Officer Paula Sauls of the Greenville Police Department testified that she was dispatched to 905 Imperial Street on 17 July 2007 in response to a report that a man had been shot at that location. At the time of her arrival, Officer Sauls saw blood leading into a house and found Mr. Andrews "collapsed [in a bedroom] in a very contorted position." Officer R.W. Coltraine of the Greenville Police Department retrieved a number of Reminington Peter 380 shell casings from the street in front

of Mr. Andrews' residence. Detective Richard Williams of the Greenville Police Department, who served as the lead investigator into the shooting of Mr. Andrews, testified that Defendant claimed to have worn the glove in order to avoid getting gunshot residue on his hands. According to Special Agent Jessica Rosenberry of the State Bureau of Investigation, at least two of the five shell casings that Officer Coltraine found outside Mr. Andrews' residence were fired from the same weapon. No weapons were found near Mr. Andrews, in his pockets, or in his house.

Chiquita Barfield testified that she and Mr. Andrews were dating in July 2007. About a week before the shooting, Ms. Barfield and Mr. Andrews were at a Greenville bus stop, at which point Mr. Andrews saw Defendant. Defendant and Mr. Andrews "had words back and forth" about some pants and a wallet that had been stolen from Mr. Andrews. However, Defendant and Mr. Andrews stayed on opposite sides of the street. Mr. Andrews began arguing first on this occasion, and Ms. Barfield had to hold him back.

On 17 July 2007, Ms. Barfield was inside Mr. Andrews' house when she heard three gunshots. After Ms. Barfield heard the shots, Mr. Andrews came inside, bleeding from his chest and mouth. Ms. Barfield summoned an ambulance and stayed with Mr. Andrews until law enforcement officers and emergency medical care arrived. Mr. Andrews, who was wearing an electronic monitoring device, died as the result of multiple gunshot wounds. According to Dr. M.G.F. Gilliland, the shot to Mr. Andrews' face was not a fatal injury. Instead, the wound that resulted in Mr. Andrews' death entered the left side of the back, passed through the body, and exited on the right side of the chest.

### B. Defendant's Evidence

Detective Richard Williams showed a photographic lineup that included Defendant's picture to Mr. Biggs, but Mr. Biggs was unable to identify anyone in the lineup. Detective Williams interviewed witnesses and viewed videotapes from the convenience store at which Defendant and Mr. Andrews had quarreled. On 19 July 2007, Detective Williams took Defendant into custody and interviewed him. Defendant introduced an audiotape of his statement to Detective Williams into evidence.

Defendant was twenty-six years old. Several years earlier, Defendant and another man had broken into a house and stolen various items, including Mr. Andrews' pants and wallet. Although he did not

know Mr. Andrews at the time of the break-in, Defendant later learned that Mr. Andrews' pants were among the stolen items. When Mr. Andrews confronted Defendant about the stolen pants, Defendant returned them. According to Defendant, Mr. Andrews remained angry at Defendant after Defendant returned Mr. Andrews' pants. Defendant testified that, whenever the two men came into contact, Mr. Andrews displayed "a real bad attitude."

On Fathers' Day in 2007, Defendant visited Eppes Gym Park with his six year old son, Ms. Benson, and Ms. Benson's daughter.[1] Mr. Andrews was also present at the park with his young daughter. While the group was in the park, Mr. Andrews approached Defendant and asked him to make a video of Mr. Andrews and his child. At the time he made this request of Defendant, Mr. Andrews spoke "properly and very nicely." Although Defendant videotaped Mr. Andrews and his daughter for several minutes, Mr. Andrews was displeased with the result and told Defendant to make another tape, which Defendant agreed to do after he finished spending time with his son. Mr. Andrews replied that making a video was "the least [Defendant] could do" in exchange for Mr. Andrews' failure to beat Defendant up following Defendant's theft from Mr. Andrews. Mr. Andrews threatened to hurt Defendant, Ms. Benson, and their son. According to Defendant, Mr. Andrews cursed and was "disrespectful." However, Defendant conceded that he was not frightened by Mr. Andrews' threats because "he didn't touch me or put his hands on me or . . . get up in my face" and because Defendant was "threatened all the time." Defendant left the park because Mr. Andrews wanted to argue and "fuss and . . . fight" in front of their children. Similarly, Ms. Benson decided to leave the park after a brief argument with Mr. Andrews. As Defendant was leaving the park, he noticed the arrival of some other men with whom he had previously had an "altercation" stemming from Defendant's "association" with the Crips, a street gang. The new arrivals, who were associated with a rival gang, the Bloods, talked to Mr. Andrews and pointed at Defendant.

In July, 2007, Defendant had another encounter with Mr. Andrews. As Defendant was bicycling, he saw Mr. Andrews and a woman waiting at a bus stop. Defendant and Mr. Andrews "had some words;" during their conversation, Mr. Andrews said that one of them might "get hurt" because of their conflict.

---

1. Although Defendant and Ms. Benson had been romantically involved, their relationship had ended in 2005.

On 17 July 2007, Defendant bicycled to a convenience store parking lot, where he planned to sell drugs. At that time, Defendant had an automatic pistol in his pocket. As Defendant, Mr. McLean, and another man named "Chill Will" were talking, Mr. Andrews arrived. Although Defendant started to leave in order to avoid having trouble with Mr. Andrews, Mr. McLean told Defendant to stay and offered to "put an end to" the dispute between Defendant and Mr. Andrews.

As Mr. Andrews emerged from the store, he approached Defendant and asked if Defendant wanted "to go around the store and fight one-on-one." However, Mr. Andrews did not touch Defendant or suggest a gunfight. After Defendant declined Mr. Andrews' invitation to engage in combat, Mr. McLean, Defendant, and Mr. Andrews discussed the incident in which Defendant stole items from a house in which Mr. Andrews was sleeping. During the conversation, Mr. Andrews continued to berate Defendant. As a result of his desire to avoid additional problems, Defendant left the store.

After changing clothes at home, Defendant rode his bicycle in the direction of the home of Ms. Benson's new boyfriend in order to visit his son. As he bicycled, Defendant saw Mr. McLean, who said that Mr. Andrews had gone to Imperial Street. Defendant did not know that Mr. Andrews lived there. A few minutes later, Defendant saw Mr. McLean on Imperial Street talking with someone. Mr. McLean called to Defendant and asked Defendant to join him. As Defendant approached, he had his gun in his right pocket. When he neared Mr. McLean and the other individual, Defendant realized that Mr. McLean was talking to Mr. Andrews. At that point, Defendant and Mr. Andrews resumed their argument about "the pants and the wallet."

According to Defendant, Mr. Andrews was standing in his yard while Defendant and Mr. McLean were in the street on their bicycles. Defendant was between Mr. McLean and Mr. Andrews at a distance of about two to three feet from both men. As Defendant turned towards Mr. McLean in order to talk with him, he noticed that Mr. McLean was looking over Defendant's shoulder and backing away. "[O]ut of the corner of [his] eye," Defendant saw that Mr. Andrews was "edging up" towards him and "reaching" behind him with his right hand. At trial, Defendant testified that:

A: . . . And, as he's reaching . . . I pulled my gun out and it happened so fast I just—I mean start shooting to protect myself.

Q: . . . [W]hy did you feel like you had to shoot?

A: I mean this—this guy's always seeing me, threatening me. He's been threaten[ing] my family. I mean at the time—I mean it just happened so quick that, I mean, I'm fearing for my life.

Q: What did you think Mr. Andrews was going to do?

A: I mean I—at the time and the way the situation was happening and looked—I mean I thought maybe hewas going to hurt me.

Q: What did you think he was going to do?

A: Maybe try to jump on me, stab me. I mean whatever it took.

Defendant needed "a way to protect" himself because he feared Andrews might try to hurt him; "the only means of protection" available to Defendant at that time was a gun.

The incident was over in several seconds. Defendant claimed to have shot Mr. Andrews because Mr. Andrews was "easing" towards Defendant and reaching for something. Defendant acknowledged that he fired several shots at Mr. Andrews in rapid succession without attempting to ascertain where his shots landed. In addition, Defendant admitted that he did not know what Mr. Andrews was "reaching" for and had not seen a weapon in his possession.

Mr. Andrews was approximately the same size as Defendant. He had never touched Defendant or "followed through" on any threat throughout the course of their dispute. In addition, Defendant admitted that he had never seen a weapon in Mr. Andrews' possession. Defendant never reported Mr. Andrews' threats to the police. Similarly, Ms. Benson did not report Mr. Andrews' behavior at the park to the police.

After Defendant shot Mr. Andrews, he went home. Defendant did not call the police because he was afraid. However, when Detective Williams arrested him, Defendant provided a statement concerning the shooting. In addition, although Defendant told Detective Williams where the gun used to kill Mr. Andrews was located, investigating officers were unable to locate it.

## C. Procedural History

On 19 July 2007, a warrant for arrest was issued charging Defendant with the murder of Mr. Andrews. On 13 August 2007, the Pitt County grand jury returned a bill of indictment charging

Defendant with the first-degree murder of Mr. Andrews. The case came on for trial before the trial court and a jury at the 26 January 2009 criminal session of the Pitt County Superior Court. Prior to trial, the trial court allowed the State's motion to amend the indictment returned against Defendant for the purpose of correcting the spelling of Mr. Andrews' middle name. At the close of both the State's evidence and all of the evidence, Defendant unsuccessfully moved to dismiss the charge against him. During the jury instruction conference, the trial court denied Defendant's request that the jury be instructed on the law of self-defense. After the arguments of counsel and the trial court's instructions to the jury, the jury returned a verdict convicting Defendant of the first-degree murder of Mr. Andrews. Based on the jury's verdict, the trial court sentenced Defendant to a term of life imprisonment without the possibility of parole in the custody of the North Carolina Department of Correction. Defendant noted an appeal to this Court from the trial court's judgment, contending that the trial court erred by failing to instruct the jury on the issue of whether he acted in self-defense.

## II. Legal Analysis

### A. Applicable Legal Principles

[B]efore the defendant is entitled to an instruction on self-defense, two questions must be answered in the affirmative: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable? If both queries are answered in the affirmative, then an instruction on self-defense must be given. If, however, the evidence requires a negative response to either question, a self-defense instruction should not be given.

*State v. Moore*, 363 N.C. 793, 796, 688 S.E.2d 447, 449 (2010) (quoting *State v. Bush*, 307 N.C. 152, 160-61, 297 S.E.2d 563, 569 (1982). In determining whether a defendant is entitled to a self-defense instruction, "the evidence is to be viewed in the light most favorable to the defendant" and, "if the defendant's evidence, taken as true,  is sufficient to support an instruction for self-defense, it must be given even though the State's evidence is contradictory." *Id.* (citing *State v. Watkins*, 283 N.C. 504, 509, 196 S.E.2d 750, 754 (1973). "The reasonableness of the belief must be judged by the facts and circumstances as they appear to the defendant, and it is a question for the jury to determine the reasonableness of

defendant's belief." *State v. Davis*, 18 N.C. App. 436, 438-39, 197 S.E.2d 6, 8 (1973) (citing *State v. Robinson*, 213 N.C. 273, 195 S.E. 824 (1938)). However:

> It is for the court to determine in the first instance as a matter of law whether there is any evidence upon which defendant reasonably believed it to be necessary to kill his adversary in order to protect himself from death or great bodily harm. If there is no evidence upon which the defendant in fact could form such a reasonable belief, then there is no evidence of self-defense and the issue should not be submitted to or considered by the jury.

*State v. Stone*, 104 N.C. App. 448, 452, 409 S.E.2d 719, 721 (1991) (citing *State v. Bush*, 307 N.C. 152, 297 S.E.2d 563 (1982); *State v. Johnson*, 166 N.C. 392, 81 S.E. 941 (1914); and *State v. Spaulding*, 298 N.C. 149, 257 S.E.2d 391 (1979), *rev. denied*, 330 N.C. 617, 412 S.E.2d 94 (1992)).

## B. Necessity for Self-Defense Instruction

Defendant contends that, viewing the evidence in the light most favorable to Defendant, "a jury could have found that [Defendant's] fear of imminent danger of death or great bodily harm was reasonable in light of the totality of the circumstances," so that the trial court erred by refusing to instruct the jury on the issue of self-defense. According to Defendant, the trial court reached a contrary conclusion because it utilized "an after-the-fact view of the circumstances, rather than judging the issue on the basis [of] the circumstances that appeared to [Defendant] to exist when he had to make the split second decision of whether to respond with force to what looked like a lethal attack." We disagree.

The evidence,[2] taken in the light most favorable to Defendant, tends to show that Defendant and Mr. Andrews had a long-standing conflict that originated from an incident in which Defendant apparently stole a pair of pants and a wallet from Mr. Andrews in 2005.[3] In attempting to establish the reasonableness of his fear of Mr. Andrews, Defendant points to the following evidence:

---

2. In analyzing the evidence, we consider only the facts and circumstances that were known to Defendant at the time of the shooting. Accordingly, we do not consider the evidence that Mr. Andrews told Mr. McLean that he wanted to end the feud or that no weapon was found near Mr. Andrews after he was shot in evaluating the merits of Defendant's argument on appeal.

3. Although Defendant admitted having stolen the pants and had returned them to Mr. Andrews, he denied having Mr. Andrews' wallet in his possession.

The testimony of Defendant that, when he and Mr. Andrews saw each other, Mr. Andrews had a "bad attitude" and brought up the stolen pants and wallet.

The testimony of Mr. McLean and Defendant that Mr. Andrews had warned Defendant that, if Defendant saw Mr. Andrews on the street or shopping in a particular store, Defendant should cross the street or shop at a different establishment.

The testimony of Defendant and Ms. Benson that, on Fathers' Day in 2007, Defendant and Mr. Andrews were at a park with their children. At that time, Mr. Andrews cursed at Defendant and Ms. Benson and threatened to hurt Defendant, Ms. Benson, and their son.

The testimony of Defendant that, when he bicycled past Mr. Andrews and his girlfriend about a week prior to the shooting, Mr. Andrews shouted at Defendant about the stolen wallet and pants and threatened to hurt Defendant.

The testimony of Defendant and Mr. McLean to the effect that, on the morning of 17 July 2007, Mr. Andrews asked Defendant if he wanted to "fight one-on-one," complained about the stolen items, and reiterated his previous advice that Defendant avoid him by crossing the street or choosing a different convenience store at which to shop.

The testimony of Defendant that, later on 17 July 2007, Defendant stopped his bicycle at Mr. Andrews' house to talk to Mr. McLean. As Defendant turned to talk to Mr. McLean, Mr. Andrews shouted at Defendant about the stolen items. Defendant saw Mr. McLean backing away and noticed "out of the corner of his eye" that Mr. Andrews was moving towards him while reaching behind his back for an unknown object.

According to Defendant, he thought Mr. Andrews might harm him with a weapon and was afraid for his life when he saw Defendant "easing" toward him and reaching behind his back. Assuming, for purposes of discussion, that Defendant actually believed that it was necessary to shoot Mr. Andrews in order to prevent Mr. Andrews from attacking him, the record evidence was insufficient to permit a reasonable jury to conclude that any such belief was a reasonable one.

In seeking to persuade us to reach a contrary result, Defendant contends that Mr. Andrews was "obsessive" about his grudge against

STATE v. PITTMAN

[207 N.C. App. 205 (2010)]

Defendant and that, over the years, Mr. Andrews made "numerous threats" to Defendant. In fact, Mr. Andrews even threatened Ms. Benson and Defendant's son. Defendant argues that, when Defendant saw Mr. Andrews moving towards him while reaching behind his back with his right hand, the two men were "in very close proximity" to each other and Defendant had "no time to make inquiry" about whether Mr. Andrews was "armed with a weapon." On the basis of this logic, Defendant contends that his belief that he needed to use lethal force in order to prevent Mr. Andrews from attacking him was a reasonable one.

Although the record clearly establishes that Mr. Andrews had threatened Defendant repeatedly, the record is devoid of any evidence that Mr. Andrews ever threatened to kill Defendant or that Mr. Andrews ever attempted to actually harm Defendant. The record contains no evidence tending to show that anyone, including Defendant, had ever seen Mr. Andrews either in possession of a weapon or attack another person. The record lacked any indication that Mr. Andrews had a reputation for violence. Indeed, the uncontradicted evidence establishes that, while Mr. Andrews had been angry with Defendant for an extended period of time, their conflict had never escalated beyond idle threats and that Mr. Andrews had never touched Defendant or made any serious effort to hurt him. Finally, there was no evidence that Mr. Andrews threatened to hurt or attack Defendant during their 17 July 2007 argument or that the encounter between Defendant and Mr. Andrews on this occasion was more heated than earlier disputes. Instead, the undisputed evidence established that Defendant had a gun in his possession at the time that he approached Mr. McLean and Mr. Andrews; that he fired multiple shots at Mr. Andrews, the first of which was not fatal; and that he continued firing as Mr. Andrews attempted to retreat to his residence. As a result, the principal basis upon which Defendant seeks to persuade us that Defendant's belief that he needed to kill Mr. Andrews in order to defend himself stems from the threats that Mr. Andrews had made against Defendant on prior occasions and Mr. Andrews' conduct at the time of the shooting.

Prior threats, without more, do not suffice to establish the existence of a reasonable need to use deadly force. For example, in *State v. McCray*, 312 N.C. 519, 521, 324 S.E.2d 606, 609 (1985), the defendant and the deceased were prison°inmates. According to the record evidence, the deceased had harassed and threatened the defendant.

*Id.* at 524-25, 324 S.E.2d at 611. However, at the time that the defendant attacked the deceased, there was no evidence that the deceased posed any threat to the defendant. *Id.* at 531, 324 S.E.2d at 614. In holding that the deceased's prior threats did not, without more, support a reasonable belief that Defendant needed to use deadly force, the Supreme Court stated that:

> Application of these principles to the facts . . . reveals that . . . there was no necessity—real or apparent—for the defendant to kill in order to protect himself from death or great bodily harm at the time in question. Defendant's evidence was to the effect that in the days preceding the fatal encounter a great deal of animosity and tension between the deceased and [defendant] was generated by the actions of the deceased in taunting and intimidating the defendant. . . . We are not persuaded by defendant's argument that [the deceased] should be considered the aggressor in the fatal affray by reason of his prior actions.

*Id.* at 530-31, 324 S.E.2d at 614. As a result, the fact that Mr. Andrews had threatened Defendant does not, under the circumstances revealed by the present record, demonstrate that the Defendant reasonably believed that it was necessary to kill Mr. Andrews in order to defend himself.

Defendant's description of Mr. Andrews' conduct immediately prior to the shooting does not, whether considered in isolation or in the context of Mr. Andrews' prior threats, suffice to support a self-defense instruction either. The fact that Mr. Andrews may have been "edging up" on Defendant while reaching behind his back with his right hand does not support a finding that Defendant reasonably believed that he needed to use lethal force in light of the fact that Defendant does not claim to have seen Mr. Andrews with a weapon on that or any occasion, that Mr. Andrews had not threatened him immediately prior to the shooting, or that Defendant had no other objective basis, aside from prior threats which had never involved or led to anything worse than an exchange of unpleasant words, for believing that Mr. Andrews was about to launch an attack on him that posed a risk that Defendant would suffer death or great bodily injury. As the Supreme Court stated in *State v. Williams*, 342 N.C. 869, 873-74, 467 S.E.2d 392, 394-95 (1996), in holding that a defendant's request for a self-defense instruction was properly denied:

**STATE v. PITTMAN**

[207 N.C. App. 205 (2010)]

Defendant testified that he saw Staton reach for his belt as if reaching for a pistol. However, defendant also testified that he never actually saw Staton with a pistol. Other than the defendant's self-serving claim that he thought Staton was reaching for a weapon, the evidence shows only that Staton approached the scene and inquired, "What's up?" repetitively. The record is totally void of any evidence showing that Staton had a pistol or threatened defendant in any manner. There is no evidence that the victim ever had a weapon or made any threatening gesture toward the defendant.

Finally, the evidence shows that the defendant fired three shots. After the first shot was fired, the victim turned and began to run away. The victim was struck, in the back, by the third shot. The fact that the victim was shot in the back while attempting to run from the scene is significant. It is entirely unreasonable to believe that a person of ordinary firmness would have considered the use of deadly force necessary to protect himself or herself from an unarmed person who was running from the scene. . . . . Even assuming that the defendant's fear was real, it did not justify a preemptive strike against an unarmed individual. Thus, the second element of perfect self-defense is not reflected in the evidence.

As a result, we conclude that there is no evidence that would support a finding that Defendant reasonably believed that he needed to use deadly force against Mr. Andrews to prevent death or serious bodily injury. Thus, the trial court did not err by declining Defendant's request that the jury be instructed on the law of self-defense.

NO ERROR.

Judges McGEE and GEER concur.